**Filed:  November 27, 2012**

IN THE SUPREME COURT OF THE STATE OF OREGON


PORTLAND STATE UNIVERSITY
CHAPTER OF THE AMERICAN
ASSOCIATION OF UNIVERSITY
PROFESSORS,

Petitioner on Review,

v.

PORTLAND STATE UNIVERSITY,

Respondent on Review.


(ERB UP3605; CA A138895; SC S059182)


En Banc

On review from the Court of Appeals.*

Argued and submitted November 7, 2011.

Elizabeth A. Joffe, of McKanna Bishop Joffe & Arms, LLP, Portland, argued the cause and filed the brief for petitioner on review.

David B. Thompson, Senior Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review.  With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Brad Avakian, Commissioner, Oregon Bureau of Labor and Industries, filed a brief as *amicus curiae*.

DURHAM, J.

The decision of the Court of Appeals is reversed.  The order of the Employment Relations Board is affirmed.

*On appeal of a final order of the Employment Relations Board, dated March 19, 2008.  240 Or App 108, 246 P3d 1162 (2010).

DURHAM, J.

This case concerns an employment discrimination dispute between Portland State University (PSU) and Portland State University Chapter of the American Association of University Professors (the Association), the exclusive representative of a bargaining unit of academic professionals employed by PSU. Those entities entered into a collective bargaining agreement that included a dispute resolution process for alleged violations of the agreement. That dispute resolution process included a "Resort to Other Procedures" (ROP) provision that permitted PSU to decline or discontinue a grievance proceeding if an Association member brought a claim regarding the same matter in an agency or court outside of PSU. Here, PSU invoked that provision to halt a grievance proceeding after an Association member filed discrimination complaints with two outside agencies, the Oregon Bureau of Labor and Industries (BOLI) and the Equal Employment Opportunity Commission (EEOC).

The Association subsequently filed a complaint with the Oregon Employment Relations Board (ERB), alleging in part that PSU had engaged in an unfair labor practice by discontinuing the contractual grievance proceeding. ERB concluded that PSU's invocation of the ROP clause constituted unlawful discrimination. It therefore declined to enforce the ROP clause and ordered PSU to submit to the grievance process. On PSU's appeal, the Court of Appeals determined that ERB erred by applying the wrong legal standard in ordering PSU to submit to the grievance process, and it therefore reversed and remanded the case for ERB's reconsideration. *PSU Association of University Professors v. PSU*, 240 Or App 108, 246 P3d 1162 (2010). The Association

1

sought review of that decision. We allowed review and now reverse the Court of Appeals decision.

The facts regarding this dispute are straightforward. As noted, Article 28 of the collective bargaining agreement between PSU and the Association outlined the dispute resolution process for resolving alleged violations, misinterpretations, or improper applications of the agreement. That process allowed the Association, acting on behalf of its members, to pursue a claim through a specified grievance procedure. The grievance procedure permitted the Association to present a member's complaint within a specific timeframe after an alleged act, omission, or condition took place. Once a grievance was submitted, the Association and PSU commenced informal and formal negotiations. If no resolution was reached, the agreement entitled the Association to submit the matter to binding arbitration. However, as noted, PSU could halt grievance and arbitration proceedings under the ROP provision contained in Article 28, division B, section 2, which provided:

> "**Resort to Other Procedures.** If, prior to seeking resolution of a dispute by presenting a grievance hereunder, or while the grievance proceeding is in progress, a member seeks resolution of the matter through any agency outside the University, whether administrative or judicial, the University shall have no obligation to entertain or proceed further with the matter pursuant to this grievance procedure or pursuant to Division C (ARBITRATION) of this Article."

(Boldface and capitalization in original.)

In 1998, Wilson was employed by PSU as a fixed-term faculty member under an annual, renewable contract. In the early fall of 2003, Wilson met with her department head on behalf of a colleague to discuss her belief that the colleague had been

sexually harassed by a third faculty member. In early December 2003, Wilson received written notice from PSU that her contract would not be renewed when it expired at the end of the academic year.[1] By the springtime, Wilson began to feel ostracized in her department position and began to suspect that it was related to her voicing support for her colleague's sexual harassment claim. On July 1, 2004, Wilson met with personnel from PSU's Office of Affirmative Action and Equal Opportunity (AA/EO) to discuss her belief that members of her department were retaliating against her. She notified AA/EO personnel that she intended to bring a formal complaint. The following day, PSU sent written notice to Wilson that it would not renew her annual contract. Shortly after receiving that notice, Wilson filed a formal complaint with the AA/EO office. Her complaint alleged that the ostracism she had suffered and her subsequent termination constituted discrimination, retaliation, and harassment. AA/EO commenced an investigation and completed a report on the matter, which was disclosed to PSU. That report recommended that PSU take no action on Wilson's complaints, and PSU adopted that recommendation.

Meanwhile, Wilson sought the Association's representation in filing a grievance on her behalf under the collective bargaining agreement. An Association

---

[1] As a general practice, PSU sent nonrenewal notices to its fixed-term faculty members around December of each year. That allowed PSU to be flexible when announcing its budget in the spring. PSU then would send an additional notice in the summertime either renewing or terminating each employee's fixed-term contract. Thus, faculty members commonly understood the December notices to be only tentative. Indeed, Wilson had previously received nonrenewal notices, and her contract was renewed each summer.

representative met with Wilson and informed her that the Association needed to investigate the merits of a potential grievance. In conducting its investigation, the Association requested information from PSU that included any findings made in the AA/EO investigation. PSU provided much of the requested information within a relatively short period of time, but it delayed releasing the AA/EO report for months. Then, citing confidentiality and relevancy concerns, PSU ultimately declined to release the report. The Association responded in February 2005 by filing a grievance alleging that PSU had violated Article 6 of the collective bargaining agreement by failing to provide it with the AA/EO report.[2] Wilson also separately completed an intake questionnaire with the EEOC regarding a potential discrimination complaint protesting her nonrenewal. The Association notified PSU that Wilson had filed an EEOC complaint.[3]

PSU thereafter refused to process the Association's grievance. It cited the agreement's ROP clause for support, and claimed that Wilson's EEOC complaint triggered its right to discontinue the grievance proceeding. The Association responded

---

[2]     Article 6 of the collective bargaining agreement required PSU to make available "all factual information reasonably required for the Association to administer" the agreement.

[3]     Wilson had completed only an intake questionnaire. However, she mistakenly believed that she had filed a formal EEOC complaint. Although a completed questionnaire may constitute a charge if certain requirements are met, *see Federal Express Corp. v. Holowecki,* 552 US 389, 128 S Ct 1147, 170 L Ed 2d 10 (2008) (finding a "charge" had been filed with EEOC under the Age Discrimination Employment Act), when the EEOC followed up on Wilson's questionnaire, it determined that the time limit for filing a complaint had passed. Wilson indicated that she had delayed contacting the EEOC because she was advised that doing so could have precluded the Association from pursuing the grievance process on her behalf.

4

that the ROP clause was illegal and unenforceable. Wilson subsequently filed a complaint with BOLI alleging that her nonrenewal was discriminatory and retaliatory. The Association also submitted a second grievance to PSU similarly alleging that Wilson's nonrenewal was discriminatory and retaliatory. In response, PSU asserted that the ROP provision was lawful and enforceable. Relying on the contentions noted above, PSU informed the Association that it would not process either grievance.

The Association then filed a claim with ERB, alleging that PSU's refusal to process the Association's grievances violated ORS 243.672(1)(g), which provides that it is an unfair labor practice for a public employer to "[v]iolate the provisions of any written contract with respect to employment relations including an agreement to arbitrate."[4] PSU responded that it did not violate the collective bargaining agreement because, under the ROP provision, it had no obligation to process the grievances once Wilson had filed EEOC and BOLI complaints. The Association replied that the ROP clause was illegal and unenforceable because application of that provision constituted unlawful discrimination under ORS 659A.030(1)(f)[5] and Title VII of the Civil Rights Act of 1964.[6]

---

[4] The Association also argued that PSU had engaged in unfair labor practices when it refused to renegotiate an illegal contract term -- specifically the ROP provision -- and when it refused to provide the AA/EO documents.

[5] ORS 659A.030(1)(f) provides that it is an "unlawful employment practice":

"For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

[6] Title VII, section 704(a), of the Civil Rights Act of 1964 provides:

ERB held a hearing and subsequently issued an order explaining its findings and conclusions of law. ERB first determined that PSU had no contractual obligation to process the grievances under the "express and unambiguous" text of the ROP clause. ERB, however, further determined that, although it generally would enforce a bargained contract provision, the ROP clause was illegal and unenforceable. ERB was persuaded by federal cases holding that an employer engages in unlawful discrimination against a bargaining member if it denies that member access to a contractual grievance procedure solely because that member made a complaint to the EEOC. *See, e.g., EEOC v. Board of Governors of State Colleges*, 957 F2d 424 (7th Cir), *cert den*, 506 US 906 (1992) (hereinafter *Board of Governors*) (so holding). ERB explained:

"The ROP provision * * * penalizes an employee who chooses to exercise rights protected under federal and state law by seeking resolution of a discrimination claim with BOLI or the EEOC. For this reason, it constitutes unlawful retaliation under both state and federal law. 42 U.S.C. § 2000e-3(a); and ORS 659A.030(1)(f)."

Thus, ERB concluded that the ROP clause was illegal and unenforceable, and it ordered PSU to process the grievances in accordance with the remaining terms of the parties' collective bargaining agreement.[7]

_____

"It shall be an unlawful employment practice for an employer to discriminate against any of his [or her] employees * * * because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

42 USC § 2000e-3(a).

[7] In regard to the Association's additional claims, ERB determined that PSU

PSU appealed ERB's order, raising two assignments of error. First, PSU asserted that ERB lacked authority to determine whether the ROP clause constituted discrimination under ORS 659A.030(1)(f) and Title VII because the Association brought its claim under ORS 243.672(1)(g). In PSU's view, ERB was limited under ORS 243.672(1)(g) to examining whether PSU had violated the express terms of the collective bargaining agreement. Second, PSU argued that ERB incorrectly concluded that PSU's invocation of the ROP clause had violated state and federal antidiscrimination laws. The Association responded that ERB was authorized to assess whether the ROP clause was discriminatory and that ERB correctly concluded that it was.

The Court of Appeals addressed each assignment of error in turn. It rejected PSU's first assignment of error, concluding instead that ERB had statutory authority to determine whether the ROP clause was an enforceable contract provision. *PSU Association of University Professors*, 240 Or App at 113-14. The Court of Appeals, however, agreed with PSU's second assignment of error.

In addressing the second assignment of error, the Court of Appeals began by noting that the Association, in presenting its case, cited both ORS 659A.030(1)(f) and Title VII, but asserted that claims under ORS 659A.030(1)(f) are assessed under the same

_____

was not obligated to renegotiate the ROP clause when the Association first attempted to do so because, by that point, the ROP clause had not been proved to be illegal. It further ordered PSU to disclose the AA/EO report. PSU and the Association do not raise arguments related to those rulings, and ERB's order requiring PSU to disclose the AA/EO report resolves the claim relating to the Association's first grievance. Thus, only PSU's refusal to process the Association's second grievance, which alleged that PSU engaged in unlawful retaliation, remains at issue. We refer to only that grievance in the text below.

legal standard as Title VII claims. The Court of Appeals concluded that, "as the issue is framed by the Association, this case depends on whether federal employment law bars the enforceability of Article 28.B.2." *PSU Association of University Professors*, 240 Or App at 115. The Court of Appeals therefore turned its attention to federal law only and, in particular, a standard under Title VII requiring an employee to establish a *prima facie* case showing that he or she was subject to an employer's discriminatory employment action. *See id.* at 115-16 (outlining the standard). The court then recognized that ERB did not apply *Burlington N. & S.F.R. Co. v. White*, 548 US 53, 126 S Ct 2405, 165 L Ed 2d 345 (2006), a recent federal case interpreting "materially adverse" employment actions under the *prima facie* standard. The Court of Appeals therefore reversed and remanded the case for ERB to reconsider the parties' claims in light of that precedent.[8] However, in so doing, the court further explained that, under *Burlington*, "[a]n adverse action gives rise to actionable retaliation only if the adverse action is so serious that it would dissuade a reasonable employee from bringing a discrimination action." *PSU Association of University Professors*, 240 Or App at 116. In applying that principle to the facts presented in this case, the Court of Appeals refined how the standard was to be applied by ERB on remand:

> "Within the context of the *Burlington* standard, we * * * conclude that a reasonable employee would not likely be dissuaded from filing a discrimination complaint because an employer defends against the

---

[8]    The Court of Appeals further suggested that ERB consider *14 Penn Plaza LLC v. Pyett*, 556 US 247, 129 S Ct 1456, 173 L Ed 2d 398 (2009), a federal case concerning a similar, contractually related discrimination claim that ERB was unable to previously consider because the case was decided after ERB rendered its decision.

complaint by seeking to consolidate the resolution of the matter into one proceeding. Accordingly, in order to establish that PSU's reliance on [the ROP clause] constitutes unlawful retaliation, the Association must show that [the clause] does something more than allow PSU to undertake such a defensive measure."

*Id.* at 117. The Association sought review, which we allowed.

Before reaching the parties specific arguments on review, which focus primarily upon the legality of the ROP clause, we first briefly address ERB's authority to examine and decline to enforce the ROP provision. ERB is a state agency operating under the authority conferred on it by the legislature. Under the Public Employees Collective Bargaining Act, ORS 243.650 to 243.782, the legislature expressly has granted ERB authority to investigate complaints and hold hearings to determine whether public employers or unions have engaged in "any unfair labor practice listed in ORS 243.672(1) and (2)." ORS 243.676(1); *see also Ahern v. OPEU*, 329 Or 428, 434-35, 988 P2d 364 (1999) (recognizing that ERB has exclusive jurisdiction to determine whether an unfair labor practice has been committed under ORS 243.672). The legislature further has empowered ERB to impose remedies when it finds that an unfair labor practice has occurred. *See* ORS 243.676(2)(b) (authorizing cease and desist orders); ORS 243.676(2)(c) (authorizing ERB to take "such affirmative action * * * as necessary" to effectuate the purposes of the act).

In this case, the Association filed a labor complaint asserting that PSU had engaged in an unfair labor practice by refusing to process Wilson's grievance under the terms of the collective bargaining agreement. As noted, ORS 243.672(1)(g) defines an unfair labor practice as including an employer's violation of "the provisions of any

9

written contract with respect to employment relations including an agreement to arbitrate." Under that provision, ERB had the authority to review and interpret the challenged contract provision. ERB concluded that the ROP clause unambiguously stated that PSU was not required to process the grievance filed on Wilson's behalf. After ascertaining the contract's meaning, ERB further determined that the ROP clause was invalid and unenforceable because it constituted unlawful discrimination under state and federal law. Although PSU challenged that latter conclusion on appeal as being beyond ERB's authority, we agree with the Court of Appeals that ERB acted within the limits of its delegated authority.

In discharging its duties, ERB regularly examines whether bargaining subjects fall within the lawful scope of collective bargaining. *See, e.g., Walter v. Scherzinger*, 339 Or 408, 121 P3d 644 (2005) (when union sought a declaratory ruling on whether a contract proposal was a prohibited subject of bargaining, ERB had authority to determine whether the proposal violated the Custodians' Civil Service Law). Moreover, the legislature has recognized ERB's authority to invalidate illegal provisions within a collective bargaining agreement. *See* ORS 243.702(1) (expressly providing that "[i]n the event any words or sections of a collective bargaining agreement *are declared to be invalid * * * by ruling by the Employment Relations Board*," then the invalid words or sections are reopened for negotiations by request (emphasis added)); ORS 243.650(4) (limiting collective bargaining over subjects prohibited by law). We conclude that ERB acted within its authority by declining to enforce the ROP provision when it determined that the provision was contrary to law.

10

We turn now to the ROP clause itself. ERB's decision not to enforce the ROP clause was predicated on the assertedly discriminatory nature of that clause. ERB specifically concluded that the ROP provision was unenforceable because it violated Oregon's antidiscrimination provision, ORS 659A.030(1)(f), and the antidiscrimination provision of Title VII, 42 USC section 2000e-3(a), each of which prohibit an employer from discriminating against an employee who has filed a complaint or has made a charge in response to an employer's unlawful employment practice under ORS chapter 659A or Title VII, respectively. Thus, we must determine whether ERB correctly concluded, as a matter of law, that the ROP clause was unenforceable because it purported to allow PSU to engage in unlawful discrimination under ORS 659A.030(1)(f) and 42 USC section 2000e-3(a). *See* ORS 183.482(8)(a) (court reviews whether an agency has erroneously interpreted a provision of law). That is a question of first impression for this court.

In analyzing ERB's interpretation of ORS 659A.030(1)(f) and 42 USC section 2000e-3(a), the Court of Appeals framed its analysis solely in Title VII terms, specifically because the Association asserted before both ERB and the Court of Appeals that discrimination claims under ORS 659A.030(1)(f) are subject to the same legal standards as claims asserted under 42 USC section 2000e-3(a). PSU, for its part, agrees that this court should focus on federal law in analyzing the Association's claims, but it bases that assertion on different grounds. In PSU's view, this court need not engage in a rigorous analysis of the standards required under Oregon's antidiscrimination provision because the Association has not offered an analysis that deviates from Title VII precedent. Stated differently, PSU asserts that, because the Association has advanced the

11

*same* analysis for both ORS 659A.030(1)(f) and 42 USC section 2000e-3(a), this court can assume without deciding that the standards required under both the state and federal provisions are the same.

PSU's suggested approach is not without support. In *State v. Pratt*, 316 Or 561, 570 n 6, 853 P2d 827 (1993), this court "assume[d], without deciding, that the analysis [was] the same" for analogous state and federal constitutional provisions when the defendant had advanced only one analysis in interpreting those provisions. *See also State v. Langley*, 314 Or 247, 259, 839 P2d 692 (1992) *adh'd to on recons*, 318 Or 28 (1993) (same); *Dept. of Trans. v. Lundberg*, 312 Or 568, 572 n 4, 825 P2d 641, *cert den*, 506 US 975 (1992) (applying that assumption). This court, however, has also subsequently explained that, "[i]n construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties." *Stull v. Hoke,* 326 Or 72, 77, 948 P2d 722 (1997); *see also Dept. of Human Services v. J. R. F.,* 351 Or 570, 579, 273 P3d 87 (2012) (addressing court's "obligation to interpret the statutes correctly, which includes an obligation to consider relevant context, regardless of whether it was cited by any party"); *Blacknall v. Board of Parole*, 348 Or 131, 139, 229 P3d 595 (2010) (stating same principle); *Newport Church of the Nazarene v. Hensley*, 335 Or 1, 16, 56 P3d 386 (2002) (in construing a statute, "this court may be aided by the arguments of counsel" but "is not bound by them").

As we shall explain, *Stull* states the better principle to apply in this case. Because this court has not yet interpreted ORS 659A.030(1)(f), we have not yet had occasion to analyze what standards apply under that provision. This case presents that

12

interpretive question. Accordingly, we must examine the text and context of the statute, and look to relevant legislative history if it aids our analysis. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009); *see also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible.").

Oregon's antidiscrimination statute -- *former* ORS 659.030, *renumbered as* ORS 659A.030 (2001) -- was first enacted in 1947, many years before Congress enacted Title VII. At that time, the Oregon Legislature Assembly declared it against public policy for the state or its political subdivisions "to discriminate against any individual" with respect to the terms of employment on the basis of "race, color, religion, sex, union membership, national origin or ancestry." Or Laws 1947, ch 508, § 2. In 1949, the 1947 act was repealed and replaced with the Fair Employment Practices Act, which set forth more detailed provisions that similarly prohibited discriminatory employment practices. Or Laws 1949, ch 221, § 14. Significantly, the 1949 provision included an antiretaliation provision that declared that it was an "unlawful employment practice" for an employer, labor organization, or employment agency to "discharge, expel or otherwise discriminate against any person" because that person opposed any unlawful employment practices or "filed a complaint, testified, or assisted in any proceeding" under the act. *Id.* at § 5(4).

The Fair Employment Practices Act remained unchanged until 1969. After 1969, the legislature amended the Act on several occasions. Despite numerous amendments to other parts of the Act, however, the text of the anti retaliation provision remained largely unchanged and its substantive effect remained intact. As noted, ORS 659A.030(1)(f) now provides that it is an "unlawful employment practice":

"For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

That statute consists of two clauses. The first protects a person who has opposed an unlawful practice. The second protects a person who has filed a complaint or otherwise assisted in an action related to an unlawful practice. The latter clause is at issue in this matter. The operative text of that clause, for the purposes of this case, makes it unlawful for an employer to *otherwise discriminate against* an employee who engaged in a protected activity, which includes, but is not limited to, filing a discrimination complaint with BOLI. *See* ORS 659A.820 (regarding the filing of complaints with BOLI). The legislature has not defined "otherwise discriminate against" as applied under ORS chapter 659A, and the legislative record relating to the enactment of subsection (1)(f) is sparse. As pertinent to our inquiry, the dictionary discloses that "discriminate" means "**2 :** to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." *Webster's Third New Int'l Dictionary* 648 (unabridged ed 2002) (boldface type in original). Applying the meaning to subsection (1)(f) as it relates to the issue presented in this case, the provision prohibits an employer from subjecting an employee who has filed a discrimination complaint to disparate treatment that disfavors that employee because that employee has engaged in a protected activity.

That understanding is consistent with the remaining prohibitions contained in ORS 659A.030(1). While the activity proscribed under each remaining subsection varies, a common theme is nonetheless discernible. In somewhat general terms, ORS

14

659A.030(1)(a) to (e) prohibit an employer, labor organization, or employment agency from subjecting an employee to disparate, adverse treatment on account of an employee's race, color, religion, sex, sexual orientation, national origin, marital status, age, or expunged juvenile record. Because discrimination is prohibited in those contexts, it is apparent that an employer, employment agency, or union may not subject an employee to treatment different than that accorded to other employees on the basis of a particular, stated classification. Subsection (1)(f) similarly prohibits an employer from treating a protected class -- *e.g.*, employees who have participated in a protected activity -- differently.

Notwithstanding that stated similarity, there is a notable difference in the text of subsections (1)(a) to (e) and subsection (1)(f). Subsections (1)(a) to (e) address more plainly the stated purpose of the Fair Employment Practices Act, namely, to provide for the elimination of discrimination in various conditions of employment on the basis of immutable characteristics. Those subsections achieve that purpose by directly prohibiting an employer from creating an invidious classification and then subjecting an employee to adverse treatment based on that classification in various, specified employment situations. *See, e.g.*, ORS 659A.030(1)(a) (prohibiting discriminatory classifications as related to hiring or discharge decisions); ORS 659A.030(1)(b) (prohibiting discriminatory classifications as related to the terms, conditions, or privileges of employment). Those protections are aided by the enforcement mechanisms that the legislature has afforded throughout ORS chapter 659A, and subsection (1)(f) in turn is written in broad terms to safeguard access to those mechanisms. Thus, we understand

15

subsection (1)(f) to assist the protective purposes of ORS chapter 659A by ensuring that any person who is engaged in protected conduct, such as opposing discriminatory practices or seeking redress in an agency or court, is not discouraged from doing so by the threat of being subjected to adverse, disparate treatment.

That distinction is consistent with how federal courts have analyzed and applied the antidiscrimination provisions of Title VII. Although federal precedent interpreting an analogous federal provision, or interpreting an Oregon provision for that matter, is not binding on this court when it interprets the law of this state, this court repeatedly has stated that Oregon courts may examine federal precedent for contextual support when they construe state statutes that parallel federal law. *See Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 21, 803 P2d 1178 (1991) (when a state statute is based upon a similar federal statute, decisions from federal courts may provide guidance but are not binding); *McKean-Coffman v. Employment Div.*, 312 Or 543, 550, 824 P2d 410 `, 314 Or 645 (1992) (examining federal legislative history to analyze Oregon statute that was "virtually verbatim" to federal statute); *Karsun v. Kelley*, 258 Or 155, 161, 482 P2d 533 (1971) (legislative history from a federal statute is helpful when Oregon statute is substantially similar). Although Oregon enacted a number of civil rights statutes many years before Congress enacted Title VII, this court too has looked to Title VII precedent to analyze claims brought under other, analogous provisions of ORS chapter 659A, particularly where subsequent amendments made by the Oregon legislature have reflected the provisions embodied in Title VII. *See Civil Serv. Bd of Portland v. Bureau of Labor*, 298 Or 307, 313-15, 692 P2d 569 (1984); *Vaughn v. Pacific Northwest Bell Telephone*,

289 Or 73, 86-88, 611 P2d 281 (1980); *School District No. 1 v. Nilsen*, 271 Or 461, 469-74, 534 P2d 1135 (1975). In addressing claims asserting a violation of subsection (1)(f), BOLI, ERB, the Court of Appeals, and federal courts commonly have looked to the framework used in analyzing claims brought under Title VII's antiretaliation provision, 42 USC section 2000e-3(a), specifically because the federal provision is substantially similar to this state's statute and because federal courts, unlike this court, have had frequent occasion to construe and directly apply those provisions. We agree with the Association that federal precedent interpreting the antidiscrimination provisions of Title VII can provide useful additional context to aid our analysis of the meaning of ORS 659A.030(1)(f).[9]

Title VII protects employees against discrimination based on "race, color, religion, sex, or national origin" in various employment contexts, such as in the hiring or discharge or employees, or in respect to the terms, conditions, or privileges of employment. 42 USC § 2000e-2(a). As noted, Title VII also contains an antiretaliation provision that is analogous to ORS 659A.030(1)(f), which, to aid the reader, we again set out:

> "It shall be an unlawful employment practice for an employer *to discriminate against* any of his [or her] employees * * * because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or *because [the employee] has made a charge,* testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

---

[9] Although we may turn to federal precedent for assistance in analyzing ORS 659A.030(1)(f), we stress that that approach is distinct from PSU's proposal that this court should assume, without deciding, that the law is the same under each.

42 USC § 2000e-3(a) (emphasis added).

Federal courts have construed Title VII in light of its curative purpose. *See, e.g., Deravin v. Kerik*, 335 F3d 195 (2d Cir 2003) (so stating). The primary purpose of the antiretaliation provision of Title VII is to promote unfettered access to the remedial mechanisms of that title. *Robinson v. Shell Oil Co.*, 519 US 337, 346, 117 S Ct 843, 136 L Ed 2d 808 (2001); *Ghirardelli v. McAvey Sales & Service, Inc.*, 287 F Supp 2d 379, 387 (2003) ("Permitting employers to discriminate against an employee because of an employee's past use of Title VII's remedial mechanisms could significantly deter employees from engaging in such proceedings."). To advance that legislative objective, federal courts have broadly construed the antiretaliation provision of Title VII as prohibiting employers from discriminating "with impunity against an entire class of acts under Title VII." *Robinson*, 519 US at 346; *Thompson v. North American Stainless, LP*, __ US __, 131 S Ct 863, 867-68, 178 L Ed 2d 694 (2011) ("Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct."). The Supreme Court recently clarified that the protections afforded under the antiretaliation provision of Title VII apply to all employer actions that are *materially adverse*, meaning actions that reasonably would deter a victim of discrimination from pursing the remedial mechanisms available under Title VII. *Burlington*, 548 US at 67-70.

ORS 659A.030(1)(f) also reflects the intention that underlies the federal provision of promoting unfettered access to remedial statutory mechanisms by prohibiting employers from discriminating against employees engaged in a broad range of protected activities. Like the antiretaliation provision of Title VII, subsection (1)(f) is

18

composed of protections for a broad array of activities linked to asserting or defending the rights of employees to seek relief from unlawful discrimination. *Cf. Burlington*, 548 US at 61-64; ORS 659A.030(1)(a)-(e). If employers, or any person for that matter, could impose adverse, disparate treatment against employees engaged in such activities, then the curative measures contained in ORS chapter 659A would be thwarted. To achieve the remedial purpose of ORS chapter 659A, subsection (1)(f) accordingly imposes a standard that restricts an employer from engaging in retaliatory activity that reasonably would impede or deter employees from pursuing their rights under that chapter. The provision further insulates employees from discrimination if they seek to vindicate their rights to be free from unlawful employment practices. However, the harm from which employees are insulated is not a theoretical or trivial harm, but one that qualifies as a substantive difference in treatment.

With that understanding in mind, we return to the parties' arguments. The Association and PSU do not directly dispute that ORS 659A.030(1)(f) is intended to promote access to remedial mechanisms. They do, however, fundamentally disagree whether the ROP clause runs afoul of that purpose. In particular, the Association claims that the ROP clause violates state and federal antiretaliation law because the clause is retaliatory on its face. In the Association's view, the ROP clause is adverse because it expressly targets a bargaining member who exercises a protected statutory right and then penalizes that member by denying access to a contractual right guaranteed to others. In that way, the policy discourages participation in the remedial process provided by statute. The Association points out, for example, that, as that policy was implemented in this

19

case, Wilson was deprived of the benefits of a bargained-for grievance procedure when PSU invoked the ROP clause to decline to process the grievance filed on Wilson's behalf.[10]

PSU rejects the Association's position, arguing instead that the ROP clause is permissible on its face because it does not necessarily penalize an employee who elects to pursue his or her statutorily protected rights. PSU argues that the clause merely gives PSU the *option* to stop the grievance process once a bargaining member has filed a complaint in an outside forum, but it does not necessitate that action. PSU further adds that the ROP clause is not plainly adverse because it amounts to a reasonable defensive measure. In other words, according to PSU, the clause requires only that a bargaining member pursue the internal dispute resolution process outlined in the collective bargaining agreement *before* pursuing outside remedies. PSU proposes that the ROP clause is a defensive sequencing provision that does not deny a bargaining member the right to an internal grievance process that is guaranteed to others, nor does it necessarily prevent a member from filing a complaint in an external forum. Rather, it simply requires that the bargaining member bring a complaint to BOLI or the EEOC at a later point in time. Thus, PSU asserts that the ROP clause, on its face, does not constitute retaliation under ORS 659A.030(1)(f) or Title VII because it does not dissuade an employee from bringing discrimination complaints and, as a result, is not adverse.[11]

_____

[10] BOLI's commissioner has appeared as *amicus curiae* and in support of the Association's position.

[11] On review, PSU has responded to only the Association's facial challenge,

20

Several federal courts have concluded that an employer has engaged in a retaliatory, adverse action if it denies an employee an important right based on his or her involvement in protected conduct. *See Wedding v. University of Toledo*, 884 F Supp 253 (ND Ohio 1995) (holding that policy requiring grievances to be held in abeyance pending resolution of judicial or administrative proceedings was illegal under Title VII and Ohio law), *aff'd in part, rev'd in part*, 89 F3d 316 (6th Cir 1996) (affirming stay of court proceedings to present legality of clause to arbitrator); *Johnson v. Palma*, 931 F2d 203 (2nd Cir 1991) (holding that union's refusal to process grievance after employee filed discrimination complaint with state agency constituted unlawful retaliation); *Fasold v. Justice*, 409 F3d 178 (3rd Cir 2005) (holding that denial of grievance procedure following filing of a discrimination complaint constituted unlawful retaliation under ADEA and Pennsylvania law).

In *Board of Governors*, 957 F2d 424, the United States Court of Appeals for the Seventh Circuit addressed a dispute almost identical to that presented in this matter. In that case, the EEOC challenged the lawfulness of a provision contained in a collective bargaining agreement between the Illinois Board of Governors of State Colleges and Universities and a union representing faculty members. The provision at issue, Article 17.2, was virtually identical to the ROP clause challenged in this case. It

---

specifically because PSU asserts that the Association makes only a facial challenge before this court. The Association has made a facial challenge as well as a challenge in the alternative that the ROP provision is discriminatory as implemented against individual employees. We resolve this dispute as a facial challenge to the ROP provision and, consequently, do not address the Association's alternative contention.

provided:

> "If prior to filing a grievance hereunder, or while a grievance proceeding is in progress, an employee seeks resolution of the matter in any other forum, whether administrative or judicial, the Board or any University shall have no obligation to entertain or proceed further with the matter pursuant to this grievance procedure."

*Id.* at 426. The Board of Governors invoked Article 17.2 and declined to process an employee's grievance because the employee had filed a discrimination claim with the EEOC. The Board of Governors defended the provision as a way to avoid duplicative litigation.

The Seventh Circuit concluded that Article 17.2 constituted a facially discriminatory policy and that application of that policy would violate an antiretaliation provision under the Age Discrimination in Employment Act (ADEA).[12] In analyzing the discriminatory nature of the clause, the court explained:

> "Article 17.2 authorizes the Board to take an adverse employment action (termination of the in-house grievance proceeding) for the sole reason that the employee has engaged in protected activity (filing an ADEA claim). Under Article 17.2 an employee must forfeit his contractual right to a grievance proceeding, a condition of his employment, or surrender his legal right to participate in litigation under the ADEA. Conversely, an employee who elects to pursue his grievance with the Board may lose his right to bring his federal age discrimination claim."

*Id.* at 430.

In concluding that the implementation of the clause would constitute

---

[12] The relevant provision of the ADEA was substantially similar to the antiretaliation prohibition contained in ORS 659A.030(1)(f) and Title VII. In particular, 29 USC section 623(d), declared it unlawful for an employer "to discriminate against any of his employees * * * because such individual * * * has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."

unlawful retaliation, the Seventh Circuit treated Article 17.2 as *per se* retaliatory.

Accordingly, it rejected as irrelevant the Board of Governors' "good faith" reason for enforcing Article 17.2 -- *i.e.*, to avoid duplicative litigation -- explaining that, "[w]hen an employee's participation in statutorily protected activity is the determining factor in an employer's decision to take adverse employment action, that action is invalid regardless of the employer's intent." *Id*. at 428.[13]

---

[13]     The *Board of Governors* decision is helpful here because the court placed the analytical focus on the policy's unequal treatment of the employees, rather than on the presence or absence of proof that the employer intended its policy to effect discrimination.  In declining to require proof of a discriminatory animus, the Seventh Circuit relied in part on a similar approach taken by the United States Supreme Court in invalidating facially discriminatory employment policies, albeit under nonretaliation-specific antidiscrimination provisions.  In *Automobile Workers v. Johnson Controls, Inc.*, 499 US 187, 111 S Ct 1196, 113 L Ed 2d 158 (1991), the Supreme Court held that Johnson Controls' policy barring all fertile women from jobs involving actual or potential lead exposure was facially discriminatory under 42 USC section 2000e-2(a), which prohibited discrimination based on sex-based classifications.  The Court noted that "[t]he bias in Johnson Controls' policy is obvious.  * * * The policy excludes women with childbearing capacity from lead-exposed jobs and so creates a facial classification based on gender." *Id.* at 197.  The Court further explained that the policy was not neutral, specifically because

> "it does not apply to the reproductive capacity of the company's male employees in the same way as it applies to that of the females.  Moreover, the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."

*Id.* at 199; *see also, Trans World Airlines, Inc. v. Thurston*, 469 US 111, 124-25, 105 S Ct 613, 83 L Ed 2d 523 (1985) (holding that employer's policy discriminated against protected individuals on the basis of age and thereby ran afoul of the ADEA even though employer acted reasonably and in good faith); *Los Angeles Dept. of Water & Power v. Manhart*, 435 US 702, 714-18, 98 S Ct 1370, 55 L Ed 2d 657 (1978) (employer's policy requiring female employees to make larger contribution to pension fund than male employees was discriminatory on its face).

The Seventh Circuit furthermore rejected the Board of Governors' position that it was free to terminate grievance proceedings because it had no obligation to provide its employees a right to grievance procedures. *Id.* at 430. In so doing, the court relied on *Hishon v. King & Spalding*, 467 US 69, 75-76, 104 S Ct 2229, 81 L Ed 2d 59 (1984), in which the United States Supreme Court had stated:

> "A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all. Those benefits that comprise the 'incidents of employment,' or that form 'an aspect of the relationship between the employer and employees,' may not be afforded in a manner contrary to Title VII."

(Internal footnotes and citations omitted.)

We find that reasoning to be persuasive in light of the purposes of Oregon's antiretaliation provision outlined above. ORS 659A.030(1)(f), like 42 USC section 2000e-3(a), prohibits an employer from subjecting any person engaged in a protected activity to disparate treatment when such treatment would impede access to the remedial mechanisms contained under those respective measures. An employment policy that expressly targets employees who have filed complaints with regulatory agencies, and then denies those employees an important right guaranteed to other employees, frustrates the remedial purpose of ORS chapter 659A and Title VII. In other words, the employer's policy would tend to dissuade employees from pursuing their protected rights because exercising those rights would result in a substantive difference in treatment.

Applying that reasoning to the case at hand, the Association asserts that the ROP clause is a plainly invalid policy because it targets a bargaining member who

24

engages in a protected activity and penalizes that member by denying access to an important contract right. PSU responds that the clause is permissible on its face because it merely gives PSU the option to, but does not require that, PSU halt internal grievance proceedings. PSU, however, mischaracterizes the effect of the ROP clause. Under the collective bargaining agreement, PSU *must* engage in the internal grievance process if the Association brings a claim alleging that PSU violated the agreement's terms.[14] In that sense, the agreement does not merely give PSU the option to consider a grievance that has been filed. The ROP clause, in contrast, removes any obligation for PSU to proceed under a grievance process that it otherwise would be compelled to follow.

PSU, however, further notes that at least one circuit court -- the United States Court of Appeals for the Second Circuit -- has reached a result that contrasts with the position taken in *Board of Governors*, 957 F2d 424. That court has determined that an employer can undertake reasonable defensive measures that are not necessarily adverse provided that employees still have leeway in accessing their statutory rights. In *Richardson v. Commission on Human Rights*, 532 F3d 114 (2d Cir 2008) *cert den*, ___ US ___, 130 S Ct 56 (2009),, an employee (Richardson) of the Commission on Human Rights and Opportunities (CHRO) -- Connecticut's analog to BOLI and the EEOC -- filed a retaliation claim after CHRO invoked an ROP-like provision, Article 15, section

---

[14] Article 28, division A, section 1, of the collective bargaining agreement between the parties provides that the Association may file a written complaint if it believes that PSU has violated, misinterpreted, or improperly applied the terms of the agreement. Article 28, division A, section 2 in turn requires that "the parties shall meet to attempt to resolve the matter" in accordance with the grievance procedure outlined under the agreement.

10(a)(2),[15] to halt collectively bargained-for grievance proceedings after Richardson filed a discrimination claim with CHRO. The Second Circuit concluded that, under the United States Supreme Court's reasoning in *Alexander v. Gardner-Denver Co.*, 415 US 36, 94 S Ct 1011, 39 L Ed 2d 147 (1974), CHRO's ROP-like clause was an "election-of-remedies provision" that did not waive bargaining members' substantive rights to pursue a discrimination complaint with CHRO, the EEOC, or in court, provided that the employee properly timed his or her complaints. *Richardson*, 532 F3d at 122-23. The Second Circuit added that CHRO's reliance on the election-of-remedies provision was not an adverse employment action in violation of Title VII. Rather, in the court's view, the bargained-for policy merely avoided "duplicative proceedings in the two fora maintained by the employer for adjudicating claims of discrimination" and did not foreclose "the right to pursue claims with non-CHRO bodies * * * [or] subsequent filing of claims with the CHRO." *Id.* at 123-24. In that sense, the court reasoned that the provision was a reasonable defensive mechanism.

PSU urges this court to adopt that position. In PSU's view, a reasonable employee would understand that he or she had to undertake internal and external claims sequentially and therefore would not be deterred from pursuing a claim with an outside agency or court. PSU adds that an employee does not have the inherent right to maintain

---

[15] The collective bargaining agreement provision at issue, Article 15, section 10(a)(2), stipulated that "disputes over claimed unlawful discrimination shall be subject to the grievance procedure but shall not be arbitrable if a complaint is filed with the [CHRO] arising from the same common nucleus of operative fact." *Richardson*, 532 F3d at 118.

26

internal and external claims simultaneously.

We find PSU's position untenable. As an initial point, we find the Second Circuit's reasoning in *Richardson* to be inapplicable to the dispute in this case. In deciding *Richardson*, the Second Circuit emphasized that Article 15, section 10(a)(2) allowed CHRO to avoid "duplicative proceedings *in the two fora maintained by [CHRO] for adjudicating claims of discrimination.*" *Id.* at 123 (emphasis added). As the italicized language discloses, *Richardson* presents a narrow situation in which the employer -- Connecticut's equivalent to BOLI and the EEOC -- maintained both the internal, collectively bargained-for grievance procedure and the external agency forum, each of which processed discrimination claims. Here, the forums are distinct, as are the claims asserted within each.

More importantly, however, we disagree with PSU's position that the ROP clause is merely a sequencing provision that, within the contractual bargaining rights of the parties involved, reasonably restricts duplicative proceedings. As noted, under the collective bargaining agreement, PSU is obligated to process a grievance submitted on the employee's behalf, which may in turn result in binding arbitration. The ability to proceed to arbitration on a claim asserting that a contract violation has occurred, as the Association points out, provides an important avenue of substantive redress. The right to seek redress for a contractual violation is distinct from the right to pursue statutory claims otherwise available to employees under ORS chapter 659A and Title VII, and the employee loses the right to pursue that redress for a contractual violation under the ROP clause if the employee elects to exercise his or her statutory right to file a claim with

27

BOLI or the EEOC. In that sense, the ROP clause penalizes an employee who seeks to exercise a statutorily protected right.

14 Penn Plaza LLC v. Pyett, 556 US 247, 129 S Ct 1456, 173 L Ed 2d 398 (2009), supports that view. In that case, the United States Supreme Court stated that, in the context of arbitration clauses in negotiated collective bargaining agreements, "a substantive waiver of federally protected civil rights will not be upheld." Id. at 273. The Court determined that a clause expressly requiring that all contractual and statutory discrimination claims proceed to arbitration rather than litigation pursuant to the terms of a collective bargaining agreement was permissible specifically because an employee was able to exercise his or her substantive statutory rights to be free from workplace discrimination.[16] Id. at 265-66. The provision in question met the remedial function of Title VII and did not penalize employees for filing claims in an outside forum by requiring the employees to waive a right to seek appropriate redress. Instead, union members were permitted to simultaneously file discrimination claims with the EEOC and other applicable agencies, but if the discrimination claims proceeded to litigation, bargaining members were compelled to undergo arbitration proceedings under the terms of the collective bargaining agreement to resolve the matter. In reaching that result, the

---

[16]    The clause provided that all specified discrimination claims "shall be subject to the grievance and arbitration procedures * * * as the sole and exclusive remedy for violations" and that "[a]rbitrators shall apply appropriate law in rendering decisions based on claims of discrimination." 14 Penn Plaza, 556 US at 252. This case does not require this court to decide the validity of a contractual arbitration clause declaring that the arbitration procedure is the sole and exclusive remedy for employment discrimination claims based on state or federal statutes.

Court specifically distinguished such an all-encompassing arbitration clause from arbitration clauses that covered only contract-based claims. *Id.* at 263-64. In the latter instance, the Court noted that employees had not, and could not, waive their substantive rights to pursue their statutory claims. *Id.* at 265-66.

The loss of a right to pursue a bargained-for grievance right is significant. As *14 Penn Plaza* notes, the right to pursue statutory remedies is critical to the achievement of the legislature's goal in forbidding discrimination. This court too has previously recognized the significance of an employee's right to pursue a claim under the statutory scheme provided in ORS chapter 659A, and has explained that that right is distinct and supplemental to rights provided under collective bargaining agreements. *See Vaughn*, 289 Or at 86-87 (relating to personal cause of action for injured worker's discrimination claim provided in ORS chapter 659A). Here, as the Association points out, the ROP clause expressly penalizes an employee who elects to pursue his or her statutory remedy by requiring that employee to forego important rights under the collective bargaining agreement between the parties. The clause permits the employer to treat employees who have pursued their statutory rights differently and less favorably than those who have not. Such disparate treatment meets the very definition of discrimination. The loss of that important contract right under the circumstances is adverse to the interests of the employee. As shown in this case, implementation of the ROP clause denied Wilson the benefits of having the union pursue her contract claim under the terms of the collective bargaining agreement solely because she elected to exercise her individual right to file a discrimination claim with BOLI. That action

29

contravened the purposes of ORS 659A.030(1)(f). As a result, PSU's action constituted illegal retaliation.

Notably, in reversing and remanding this case, the Court of Appeals concluded that ERB incorrectly concluded that the ROP clause was retaliatory because it failed to consider whether the Association presented a *prima facie* case of retaliation under the Title VII standard as explained by the United States Supreme Court in *Burlington*, 548 US 53. *PSU Association of University Professors*, 240 Or App at 115-18. Under that standard, when an employee has asserted an individual claim of retaliation under Title VII, federal courts have required an employee to prove: (1) that the employee engaged in a statutorily protected activity; (2) that the employee was subjected to the employer's adverse action; and (3) that there was a casual connection between the protected activity and the adverse action. *Somoza v. University of Denver*, 513 F3d 1206, 1212 (10th Cir 2008). As noted, in *Burlington*, the Supreme Court clarified that, to establish the second prong of that test, an employee must show that "a reasonable employee would have found the challenged action *materially adverse*," meaning that the challenged action " well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[17] 548 US at 68 (internal quotation

---

[17] BOLI has adopted a rule interpreting ORS 659A.030(1)(f) reflecting those *prima facie* requirements:

"(2) An employer will be found to have unlawfully retaliated against an employee if:

"(a) The employee has engaged in a protected activity by:

"(A) Explicitly or implicitly opposing an unlawful practice or what

30

marks omitted; emphasis added).

In finding that that standard had not been met, the Court of Appeals implied that evidence of the implementation of a retaliatory employment policy, such as that considered in *Board of Governors*, was somehow incongruous with the standard of proof required under the antiretaliation provision of Title VII as discussed in *Burlington*. We do not read the standard for proving a retaliation claim discussed in *Burlington* as being incompatible with the standard for challenging the retaliatory employment policy discussed in *Board of Governors*. Rather, as noted, a policy that targets an employee who has exercised his or her statutory right to file a discrimination complaint, and then denies that employee an important right, directly frustrates the purpose of the applicable antidiscrimination statutes by dissuading employees from pursuing claims to protect the rights afforded by those provisions. The Association argues as much in its challenge before this court, and we agree with that position. As noted, the loss of the right to pursue a grievance over discrimination claims is important, and a reasonable employee

_____

the employee reasonably believed to be an unlawful practice, or

"(B) Filing a charge, testifying, or assisting in an investigation, proceeding, or lawsuit under ORS 659A, or attempting to do so;

"(b) The employer has subjected the employee to any adverse treatment, in or out of the workplace, that is reasonably likely to deter protected activity, regardless of whether it materially affects the terms, conditions, or privileges of employment; and

"(c) There is a casual connection between the protected activity and the adverse treatment."

OAR 839-005-0125.

would seek to protect such a right. Accordingly, the loss of a contract right is likewise material under 42 USC section 2000e-3(a).

We conclude that ERB correctly held that the ROP clause at issue in this case imposes a form of employer retaliation for protected conduct that reasonably would impede or deter an employee from pursuing his or her statutory rights. The resulting harm is neither theoretical nor trivial, but qualifies as a substantive difference in treatment. The ROP provision is therefore facially discriminatory under ORS 659A.030(1)(f). The ROP provision also is facially discriminatory under Title VII. Accordingly, ERB properly declined to enforce that illegal contract provision.

The decision of the Court of Appeals is reversed. The order of the Employment Relations Board is affirmed.