DEHOOG, P. J., *462 *397 Petitioners seek judicial review of a final order of the Environmental Quality Commission relating to property owned and previously operated as a landfill by petitioner, Kinzua Resources, LLC (Kinzua). Petitioners contend that the commission lacked authority to impose fines against petitioner Demers, an individual who met and corresponded with the Department of Environmental Quality (DEQ) regarding Kinzua's land disposal site, or against petitioners ATR Services, Inc. (ATR), and Frontier Resources, LLC (Frontier), two entity members of Kinzua. Acting under ORS 459.205 and ORS 459.268, the commission fined each of those parties on the theory that they were persons "controlling" a landfill site within the meaning of those statutes and were, therefore, required to comply with the applicable landfill permit and OAR 340-095-0090. In light of the text, context, and legislative history of ORS 459.205 and ORS 459.268, we conclude that the statutory term "controlling" means actually exercising "restraining or directing influence" over a landfill site or the property on which it is located, and not merely having the authority to do so or communicating on behalf of an entity exercising such control.[1] Because the commission's decision relied on an erroneous interpretation of those provisions of law, we reverse and remand the final order.
We begin by reciting the relevant aspects of the administrative law judge's (ALJ) findings of fact, most of which were adopted by the commission and are not challenged on appeal.
Kinzua is a limited liability company registered in Oregon. Kinzua has only two members, Frontier and ATR, both of which are entities registered to conduct business in Oregon. Demers is a member of Frontier, as well as a shareholder in, and the president of, ATR. Demers is neither the sole member of Frontier nor the sole shareholder of ATR.
In 1996, Kinzua acquired a sawmill and wood waste landfill located on adjacent parcels in Pilot Rock, Oregon. Kinzua also acquired approximately 300,000 acres *398 of timberland. Kinzua operated the sawmill and landfill until at least 2010. The landfill's sole purpose was to accept wood waste from the adjacent sawmill. Kinzua sold the marketable timberland in 1998 but retained ownership of the sawmill and landfill until February 2006, when Kinzua sold the properties on which those facilities were located to LeeLyn, Inc. and Wiley Mt., Inc. For some time after that sale, Kinzua continued to operate the sawmill and landfill.
In late February 2005, Kinzua applied for a renewal of its solid waste permit, and, in May 2006, DEQ issued a solid waste disposal site permit identifying Kinzua as the permittee, property owner, and facility operator. The permit, which expired on February 28, 2016, authorized Kinzua to accept wood waste and related debris at the landfill from the onsite activities of the adjacent sawmill.
Among other things, Kinzua's permit required the permit holder to maintain continuous financial assurance for the costs of closing down the landfill and post-closure maintenance and related activities. See ORS 459.205 ; ORS 459.268 ; OAR 340-095-0090. In October 2006, Kinzua provided DEQ with a financial assurance plan that estimated certain per-acre closure and post-closure costs. DEQ found the estimated per-acre costs to be reasonable but determined that the plan failed to account for the total acreage of the landfill. Using Kinzua's plan, DEQ recalculated the estimated costs and determined that the total costs associated with closure and post-closure activities would be $1,445,040.
In December 2009, LeeLyn and Wiley Mt. quitclaimed the landfill site back to Kinzua as part of a larger plan to sell the sawmill to Boise-Cascade. Following its acquisition of the sawmill, Boise-Cascade delivered 40,000 cubic yards of wood waste to Kinzua's landfill. Since that delivery in September 2010, Kinzua has not accepted any waste at the landfill. As of the hearing date in late 2014, however, Kinzua had not closed the landfill.[2]
*463 *399 In summer 2010 and again in summer 2011, one or more surface fires erupted at the landfill. In 2010, Demers and other members and shareholders of Frontier and ATR agreed that Demers would respond to DEQ's inquiries regarding issues related to the landfill site. From that time on, DEQ exclusively communicated with Demers regarding such issues, including fire-control efforts at the site and the financial assurance requirements of the permit.
On July 17, 2010, DEQ issued a Notice of Civil Penalty Assessment and Order alleging that Kinzua had violated certain administrative rules and the requirements of its permit by failing to maintain financial assurance in an amount sufficient to cover the costs of closure and post-closure maintenance. Following a default by Kinzua, DEQ issued a final order in March 2011, in which it found that Kinzua had failed to maintain the required financial assurance and assessed a civil penalty against Kinzua in the amount of $25,075. The order also directed Kinzua to secure the financial assurance required by its permit. Kinzua has not complied with that order.
In August 2013, DEQ issued the amended notice at issue in this case, once again naming Kinzua as a responsible party, but also naming others, including Demers, Frontier, and ATR as persons "owning or controlling" the land disposal site. In its amended notice, DEQ proposed civil penalties totaling $790,062 against each of those parties, jointly and severally, in connection with Kinzua's landfill site. DEQ alleged, among other things, that, between July 1, 2011 and August 23, 2013, petitioners had failed to notify DEQ of a surface fire at the site, failed to close the disposal site after it stopped accepting waste, and failed to maintain financial assurance.
In addition to adopting the foregoing factual findings as its own, the commission found-contrary to the ALJ's findings-that Demers had exercised control over the landfill site. To support that finding of control, the commission made additional findings of fact.
The commission found, based on email communications between DEQ and Demers in 2010 and 2014, that Demers had provided for fire control measures at the landfill *400 in response to DEQ's requests, that he had been working with a consultant in an effort to resolve problems arising at the landfill, and that he had identified himself as a member of Kinzua. The commission also found that Demers had signed a contract engaging fire control services on behalf of Kinzua, identifying himself as Kinzua's president in the process. Finally, the commission found that Demers had signed the registration form seeking reinstatement of Kinzua with the State of Oregon Corporation Division.
The commission, in part, based its findings regarding Demers's control of the landfill site on his own, some-what inconsistent testimony at the hearing. For example, when asked what his relationship with Kinzua was, Demers stated, "I believe I'm the president and secretary. No, I take that back. I'm sorry. I personally don't believe I have a relationship. You mean me or one of my * * * I don't have a relationship to Kinzua."
The commission observed that the record contained "significant evidence" of Demers's operational relationship with Kinzua. For example, Demers had exchanged an email with DEQ following up on a meeting between the two in which they had discussed Kinzua's violation of the financial assurance requirement of its permit. In another email, Demers described operations "we" have taken at the landfill and referred to the landfill's permit as "our permit." The commission found that such documentary evidence was consistent with the testimony of a DEQ representative that Demers had demonstrated his control of the landfill during the violation period alleged in the amended notice. Demers also testified that he and his "partners" had agreed in 2010 that he would be the one delegated to deal with the "whole DEQ thing" when it "came up." Accordingly, the commission found that Demers both had and exercised control over the landfill site. Based upon those findings, the commission concluded that Demers personally was liable for the violations of ORS 459.205 and ORS 459.268.[3]
*464 *401 The commission also concluded that Frontier and ATR were controlling persons under those statutes. In contrast to its assessment of Demers's role, however, the commission made no specific findings regarding those entities' actions in connection with the landfill. Instead, the commission concluded as a matter of law that ATR and Frontier were liable based on their authority to control Kinzua and its property, including the landfill. The commission noted that, under Kinzua's articles of organization, Kinzua was to be managed by its members, and that Kinzua's only members were ATR and Frontier. And, according to the commission, ATR and Frontier had "presented no evidence to the contrary at the hearing." The commission therefore concluded that, as a matter of law, ATR and Frontier were persons "controlling" the landfill site by virtue of their membership in Kinzua. The commission expressly acknowledged that DEQ had not presented any evidence that ATR and Frontier had actually exercised that legal control. The commission nonetheless concluded that ATR and Frontier were liable under ORS 459.205 and ORS 459.268 by virtue of the control that they had over the landfill, regardless of whether they had exercised that control.
On appeal, petitioners assign error to the commission's findings that Demers, ATR, and Frontier were persons controlling the landfill site within the meaning of ORS 459.205 and ORS 459.268. In their assignments, petitioners specifically argue that the commission erroneously interpreted the term "controlling" in ORS 459.205 and ORS 459.268 to encompass petitioners' conduct or their status as members of Kinzua.[4] See ORS 183.482(8)(a). The question whether the commission properly construed the term "controlling" poses an issue of statutory interpretation. Petitioners and respondents propose competing definitions for "controlling." Petitioners assert that a person in control of a land disposal site is akin to a landfill operator, such that the person must be shown to have actively participated *402 in the operation or maintenance of a landfill during the relevant period to be liable under either statute. Respondents, on the other hand, contend that the definition of control is more expansive, such that it does not require active participation and encompasses those with the authority to control a land disposal site, whether or not they actually exercise that authority.
As with all matters of statutory construction, we begin with the text and context of the relevant statutory provisions in an effort to determine the legislature's intended meaning. See Polacek and Polacek , 349 Or. 278, 284, 243 P.3d 1190, 1193 (2010) (the text and context are the "best evidence of the legislature's intent"); State v. Gaines , 346 Or. 160, 171, 206 P.3d 1042 (2009) (text and context are "primary" and must be given "primary weight" in the analysis). We will consult the legislative history of the statute to the extent that such history appears useful to our analysis. Gaines , 346 Or. at 172, 206 P.3d 1042. If the legislative intent remains unclear after examining the text, context, and legislative history, we may resort to general maxims of statutory construction. Id.
We first examine the relevant text. ORS 459.205(2), which sets forth the permit requirement for landfills that have been closed, provides:
"The person who holds or last held the permit issued under subsection (1) of this section, or, if that person fails to comply, then the person owning or controlling a land disposal site that is closed and no longer receiving solid waste must continue or renew the permit required under subsection (1) of this section after the site is closed for the duration of the period in which the department continues to actively supervise the site, even though solid waste is no longer received at the site."
*465 (Emphasis added.) ORS 459.268, which sets forth the post-closure maintenance requirements for landfills, provides:
"When solid waste is no longer received at a land disposal site, the person who holds or last held the permit issued under ORS 459.205 or, if the person who holds or last held the permit fails to comply with this section, the person owning or controlling the property on which the disposal site is located , shall close and maintain the site according to the *403 requirements of this chapter, any applicable rule adopted by the Environmental Quality Commission under ORS 459.045 and any requirement imposed by the Department of Environmental Quality as a condition to renewing or issuing a disposal site permit."
(Emphasis added.) The legislature has not defined "controlling" as used in those statutes.
Generally, when a word is not statutorily defined, we assume that the legislature intended for the word to have its ordinary meaning. State v. Cox , 219 Or. App. 319, 322, 182 P.3d 259 (2008) ; see Karjalainen v. Curtis Johnston & Pennywise, Inc. , 208 Or. App. 674, 681, 146 P.3d 336 (2006), rev. den. , 342 Or. 473, 155 P.3d 51 (2007) (words of common usage typically should be given their plain, natural, and ordinary meaning). "The principal source for determining ordinary meaning is a dictionary of common usage." Cox , 219 Or. App. at 322, 182 P.3d 259. When consulting that definition, it is important to keep in mind the part of speech that the legislature used. Id. Consistently with the principle, we note that, in both ORS 459.205 and ORS 459.268, the legislature used the term "controlling," a verb, rather than "control," a noun. Accordingly, we look to the dictionary definition of the verb "control."
As the commission observed, the verb "control" is defined, in relevant part, as "to exercise restraining or directing influence over" and "to have power over." Webster's Third New Int'l Dictionary 496 (unabridged ed. 2002). Although those dictionary definitions are helpful, they are not the end of our textual analysis. That is particularly true here, where the meaning "to exercise restraining or directing influence over" supports petitioners' interpretation of "controlling," whereas the definition "to have power over" supports respondents' construction and the commission's application of the statutes. After further examining the text, we are persuaded that the concept of exercising "restraining or directing influence over" better reflects the legislature's chosen text for two reasons.
First, by using the term "controlling," the legislature chose the present form of the verb control. That choice, much like the part of speech that the legislature chose, can inform our understanding of the legislature's intended meaning.
*404 See, e.g. , Martin v. City of Albany , 320 Or. 175, 181, 880 P.2d 926 (1994) ("[W]e do not lightly disregard the legislature's choice of verb tense, because we assume that the legislature's choice is purposeful. In most cases, we best effectuate the legislative intention by giving effect to the plain, natural, and ordinary meaning of the verb tense chosen by the legislature."). And, in both ORS 459.205 and ORS 459.268, the reference to a person "controlling" a landfill site suggests a person actively involved with the land disposal site. Merely having power over a site, on the other hand, does not readily evoke active involvement in that site.
Second, under both ORS 459.205 and ORS 459.268, the primary responsibility for renewing the permit and closing the landfill site is on the permittee. If the permittee fails to discharge that responsibility, then the statutes allocate it to the person "owning or controlling" the landfill site. In that situation, then, the person owning or controlling the landfill site steps into the shoes of the permittee and must do those things that the permittee failed to do as required. And, in our view, the legislature would reasonably have assigned that role to persons whose involvement with the land disposal site was most comparable to the permittee who previously had operated or maintained the landfill. Overall, then, the text of ORS 459.205 and ORS 459.268 aligns best with the definition of "controlling" as exercising "restraining or directing influence over."
The statutory context provides little further assistance. Generally, context can include *466 other provisions of the same statute, the session laws, and related statutes, as well as the preexisting common law and statutory framework within which the law was enacted. Stevens v. Czerniak , 336 Or. 392, 401, 84 P.3d 140 (2004). We note that, here, the parties disagree as to what context is most relevant to our inquiry. Respondents argue that the most pertinent context is ORS chapter 459 as a whole, which they contend evinces a legislative intent to broadly define "control." Petitioners on the other hand, direct our attention to federal law. Emphasizing that no other Oregon statute uses the phrase "owning or controlling"-and none clarifies specifically what it means to control a landfill-petitioners argue that the *405 most helpful context can be found in analogous federal law, where liability depends on direct control. Respondents rejoin that, because they do not use the term "controlling," the federal statutes that petitioners identify are no more helpful than the state law context on which respondents rely. We consider those arguments below, ultimately concluding that none of the proposed context provided by the parties is particularly helpful in clarifying the meaning of "controlling" as that term is used in ORS 459.205 and ORS 459.268.
As noted, respondents argue that ORS chapter 459, as a whole, provides the best context. Respondents observe that the focus of that chapter is landfill safety. To that end, the legislature has provided measures governing the safe operation and decommissioning of landfill sites; the legislature has also allocated the financial burden of ensuring that safety to those who operate, own, or control sites. In respondents' view, that purpose is best served by a broad reading of "controlling," so as to minimize the likelihood that those ends will go unserved. To be sure, much of ORS chapter 459 is directed at public safety and mitigating the environmental impact of both active and inactive landfill sites. See, e.g. , ORS 459.017(1)(a) (the planning, location, acquisition, development, and operation of landfills is a matter of state-wide concern); ORS 459.045(1)(a) (the commission is tasked with development of rules to prevent the spread of disease or pollution of air, water, or land). However, that overriding purpose of protecting public safety sheds little light on the meaning of specific terms within the chapter. It certainly cannot, in our view, bridge the gap-if one exists-between liability based on actual control over a landfill site and liability based upon mere authority to control the site, whether or not actually exercised.
Turning to petitioners' argument, they contend that federal regulations addressing solid waste management-as well as federal case law interpreting those regulations-should inform our assessment of the intended meaning of "controlling." Petitioners point to the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA), 42 USC §§ 6901 - 6992k, which, like ORS chapter 459, addresses solid waste management.
*406 Similarly to Oregon's statutes, RCRA's regulations require that the "owner or operator" of a landfill facility provide financial assurance for the closure and post-closure costs of the landfill site. 40 CFR §§ 265.143, 265.145, 265.147. RCRA also authorizes the Environmental Protection Agency to take action against any person who is the "owner or operator of a treatment, storage, or disposal facility[.]" 42 USC § 6973(a). Notably, however, even though RCRA establishes a landfill permitting and liability scheme similar to Oregon's, it imposes liability on an "owner or operator " of a landfill site, rather than the person "owning or controlling " the landfill site, as ORS 459.205 and ORS 459.268 provide. (Emphases added.) Because of that potentially significant difference in wording, the parties dispute the extent to which federal case law interpreting RCRA should inform our construction of the term "controlling" under Oregon law.
As a general matter, we can examine federal precedent for contextual support when construing state statutes that "parallel" federal law. PSU Association of University Professors v. PSU , 352 Or. 697, 710-11, 291 P.3d 658 (2012) ; see also McKean-Coffman v. Employment Div. , 312 Or. 543, 550, 824 P.2d 410, adh'd to on recons. , 314 Or. 645, 842 P.2d 380 (1992) (examining federal legislative history to analyze Oregon statute that was "virtually verbatim" with federal statute);
*467 Badger v. Paulson Investment Co., Inc. , 311 Or. 14, 21, 803 P.2d 1178 (1991) (when a state statute is based on a similar federal statute, federal court decisions may provide guidance, but are not binding); Karsun v. Kelley , 258 Or. 155, 161, 482 P.2d 533 (1971) (finding legislative history of a federal statute helpful in construing a substantially similar state statute).
However, after reviewing the federal statutes and regulations identified by the parties, as well as case law construing them, we are unpersuaded that those authorities provide helpful context for our analysis. It is true, as petitioners point out, that ORS 459.205 and ORS 459.268 were adopted as a means of implementing an Oregon solid waste regulatory program in compliance with RCRA. See 42 USC § 6947 (authorizing state programs); ORS 459.046 (authorizing the commission and DEQ to obtain approval *407 of a solid waste regulatory program under RCRA). And, as noted, RCRA has permitting and financial assurance requirements similar to Oregon's. But, despite the language of RCRA and the legislature's evident awareness of its provisions, we cannot overlook the legislative choice of "person owning or controlling" where federal law employs "owner or operator." That distinction suggests that the legislature did not intend for ORS 459.205 and ORS 459.268 to wholly parallel the federal provisions. Accordingly, case law construing the federal provisions provides little guidance here.
The absence of helpful context does not necessarily end our inquiry. After examining the text and context of a statute, we will consult legislative history where that history appears useful to our analysis. Gaines , 346 Or. at 172, 206 P.3d 1042. Here, the parties argue that the legislative history supports each of their proposed definitions of "controlling." As with the parties' contextual arguments, however, we do not find the legislative history of the relevant portions of ORS 459.205 and ORS 459.268 to be particularly helpful.
In 1983, the legislature amended ORS 459.205 and ORS 459.268 to add the provisions at issue in this case, specifically providing that, if a landfill permittee fails to comply with the terms of a permit or related laws, the person owning or controlling the landfill property must close and maintain the site. Or. Laws 1983, ch. 766, §§ 7, 2. In the course of adopting those changes, the legislature did not expressly discuss the term "controlling," nor does anything in the legislative history suggest that the legislature understood the term to have a specific meaning.
In contending that the legislative history demonstrates that the legislature intended "controlling" to mean actively participating in landfill operations, petitioners point to statements made during committee meetings by several representatives of DEQ and the Oregon Sanitary Service Institute. In those meetings, the representatives tended-conversationally, at least-to equate the person "controlling" the landfill site with the "operator" of the landfill. See, e.g. , Tape Recording, House Committee on Environment and Energy, H.B. 2241, May 20, 1983, Tape H-83-EE-213, Side A (statement of Oregon Sanitary Institute representative *408 Roger Emmons). Petitioners contend that that usage demonstrates that, in contemplating the term "controlling," the legislature's focus was on persons operating landfill sites, and so is consistent with the concept of an "owner or operator" under RCRA. However, although it is true that committee members appeared to have referenced persons "controlling" landfills interchangeably with "operators" of them, the legislature ultimately opted for the term "controlling." That ambiguous history leaves us uncertain whether the legislature intended a different meaning because it used a different word, cf. State v. Meek , 266 Or. App. 550, 556, 338 P.3d 767 (2014) (citing the "general assumption that, when the legislature employs different terms within the same statute, it intends different meanings for those terms" (internal quotation marks omitted) ), or, instead, simply chose one of two words that it deemed equivalent. As a result, that legislative history is ultimately unhelpful.
For their part, respondents argue that the legislative history supports the commission's broad interpretation of "controlling." Respondents point to a representative's prepared statement, as well as staff analyses of the house bill that led to ORS 459.205 and *468 ORS 459.268, and argue that they all suggest that solid waste management-and landfill closures in particular-are issues of public health, safety, and welfare. See, e.g. , Staff Measure Analysis, House Committee on Environment and Energy, H.B. 2241 1983; Staff Measure Analysis, Senate Committee on Rules, H.B. 2241 1983. And, as with respondents' characterization of ORS chapter 459, we agree with that broad contention, as far as it goes. Again, however, we fail to see how that broad underlying purpose can inform our understanding of the specific reach of ORS 459.205 and ORS 459.268. As a result, we are no more persuaded by respondents' reliance on legislative history than by petitioners'.
Thus, after considering the context and legislative history of ORS 459.205 and ORS 459.268, we conclude that we must return to the plain text of those statutes to determine what "controlling" means. And, in our view, the best reading of that text is that the term "controlling" is directed at those persons actively involved in the operation *409 or management of a landfill site; in other words, those who, after a permit holder fails to comply with its obligations under a landfill permit regarding a particular site, step in and exercise restraining or directing influence over that site.
Our conclusion that "controlling" means exercising "restraining or directing" influence over a disposal site leaves open the question whether substantial evidence and reason support the commission's conclusions that Demers, ATR, and Frontier were persons controlling Kinzua's landfill site at the time of the alleged violations.[5] We do not, however, reach that question. It may be that, with the correct understanding of "controlling" in mind, the commission will again determine that one or more of the petitioners is liable; on the other hand, it may determine that the evidence does not support the conclusion that any of the petitioners were "controlling" persons within the meaning of ORS 459.205 and ORS 459.268. In our view, it is appropriate to allow the commission to make those determinations applying the correct meaning of the statutes in the first instance, and to give the commission an opportunity to explain its reasoning anew. See ORS 183.482(8)(a)(B) (authorizing that disposition when agency decision relies on an erroneous interpretation of the law). Accordingly, we reverse and remand the final order.
Reversed and remanded.

The text of those statutes is set out below, 295 Or. App. at 402-03, 434 P.3d at 464-65.

Under ORS 459.268, a landfill that is no longer receiving solid waste must be closed and maintained in compliance with the terms of the landfill permit and applicable laws.

On appeal, no party challenges the commission's conclusions that those statutes and the related requirements of Kinzua's permit and the applicable regulations had been violated. Thus, the only issue in this appeal is whether petitioners may be held liable for those violations.

Like Frontier and ATR, Demers argues on appeal that the commission erroneously construed ORS 459.205 and ORS 459.268. Demers does not separately contend that, to the extent his personal conduct otherwise constituted "controlling" under those statutes, he acted merely as an agent of Kinzua or another business entity and therefore cannot be held personally liable.

Neither ATR nor Frontier disputes that "persons" under the relevant statutes includes legal entities such as limited liability companies and corporations. See ORS 459.005 (18) (providing that "person" means, among other things, an "individual, partnership, association, firm, trust, estate or any other legal entity").