DeVORE, P. J.
*1173 *157 This case involves a Christian college that refused to hire a Jewish applicant for a new position as an adjunct psychology professor. The issue concerns the meaning of ORS 659A.006(4), Oregon's religious preference exemption.
Plaintiff appeals from a general judgment of dismissal entered after the trial court granted summary judgment to defendant on plaintiff's religious discrimination claim under Oregon's antidiscrimination statute, ORS 659A.030. Plaintiff argues that the court erred in granting defendant's motion for summary judgment based on its defenses under ORS 659A.006(4) (religious preference exemption) and ORS 659A.030(1)(a) (bona fide occupational qualification). Defendant contends that either one of those two alternative defenses, as well as a constitutional "ministerial exception," permitted religious discrimination in this case.
We conclude that defendant's decision was permissible under the religious preference exemption, ORS 659A.006(4). Without reaching the other defenses, we affirm.
I. PROCEEDINGS
We begin by introducing defendant Warner Pacific College and plaintiff's application to teach there. Later, we provide detail about the college, the position, and the course, which relate to the religious preference exemption. Although the parties disagree about the application of the law, the material facts are undisputed.
Warner Pacific College is a private Christian liberal arts college in Portland. The college describes itself as an "agency" of the Church of God in Anderson, Indiana. Founded in 1937 in Spokane, Washington, it was incorporated as Pacific Bible College and operated to prepare church leaders during its early years. Later, the college relocated to Portland and changed its name to Warner Pacific College to honor one of the early founders of the church. Despite the name change and relocation, the college considers itself to have "always been a Church of God College."
*158 At Warner Pacific, employees are provided with the college's statement of its Employment and Lifestyle Standards. The Standards statement declares, "Central to Warner Pacific's identity as a Christ-centered higher education institution is the policy of hiring persons whose personal and professional lives reflect," among other things,
"1. A belief in the deity of and commitment to Jesus Christ and the Christian faith, as interpreted through the historic witness of Scripture and the continuing ministry of the Holy Spirit.
"2. The practice of following Christ through day-to-day personal lifestyle choices.
"3. A vitality of Christian experience maturing in insight and application and appreciative of differing view-points.
"* * * * *
"6. A capability, by temperament, preparation, and will, to support students as they confront the intellectual, social, physical, emotional, and spiritual challenges of their lives.
"7. A sensitivity to and support for the mission, core themes, vision, values, ethos and traditions of the Warner Pacific College community.
"8. A commitment to teaching and serving in harmony with the doctrines of the Bible as understood and generally held by the Church of God Reformation Movement."
The Standards statement is accompanied by an "Employee Agreement," which provides, in part:
*1174 "Mission-based hiring is of critical importance to Warner Pacific College. From its inception, the Church of God has resisted condensing the Scriptures into a formal creed, instead emphasizing salvation as the entrance into the body of Christ; unity in diversity; and a call to holy living as God's people representing Christ in the world. Warner Pacific, rather than requiring subscription to an institutional doctrinal statement, asks each employee to affirm a personal faith in Jesus Christ by providing a statement articulating the ways in which faith informs the employee's understanding of his or her vocation at Warner Pacific. Employees are expected to demonstrate and articulate a *159 vital Christian faith and to live in a manner consistent with a Christ-centered lifestyle as informed by the Scriptures of the New Testament."
The Employment and Lifestyle Standards and the Employee Agreement were posted online in conjunction with an announcement of the opening of the position for which plaintiff applied. The posting added that, "[b]ecause Warner Pacific is a Christian liberal arts college, the college exercises its legal right to hire Christian employees to fulfill its mission and purpose."
In April 2014, plaintiff applied online for a position at Warner Pacific College as an adjunct psychology professor. The online application asked for the applicant's "church fellowship or denomination affiliation," and plaintiff responded, "I am of the Hebrew faith." The application asked the applicant to "[b]riefly describe your Statement of Christian Faith," and plaintiff responded, "My faith is important to me because of the guidelines it has provided regarding how to treat other human beings and the world in which we all reside."
The application required each applicant to read Warner Pacific's Employment and Lifestyle Standards and submit essay responses to two questions:
"1. How does your personal faith reflect the principles stated in terms 1, 2, and 3 of the Employment Standards? ***
"2. How does your personal philosophy of education and commitment to the synthesis of faith and learning reflect the principles stated in items 4, 5, 6, 7, and 8? ***"
Initially, plaintiff submitted his application without answering those two questions, but he later supplemented his application with the answers. In those answers, he reaffirmed his Jewish faith and stated that the "compatibility between [his] life lessons and the teachings of Jesus Christ is undeniable." He elaborated, "While I may not be able to cite many verses from Scripture, I believe that I have lived a life that is consistent with the teachings of both the Old Testament and the New Testament."
*160 The college's hiring committee interviewed plaintiff and asked him to give a teaching demonstration. However, Warner Pacific's president, Dr. Andrea Cook, who is ultimately responsible for hiring decisions, rejected plaintiff's application. Plaintiff was notified that he was not selected because he is not a "Christ-follower." Rather than hire an applicant for the new position, Warner Pacific chose at that time to assign the duties, which the position would have performed, to current employees who were Christian.
Plaintiff sued Warner Pacific, alleging that the college's decision to refuse to hire him on the basis of his religion constituted unlawful religious discrimination under ORS 659A.030 and ORS 659A.006. The parties filed cross-motions for summary judgment.
Warner Pacific argued, for three reasons, that it was entitled to summary judgment despite plaintiff's claim of religious discrimination claim. First, the college argued that the claim was barred by ORS 659A.006(4), which permitted it, as a Christian college, to "prefer" to hire Christians and prefer not to hire non-Christians. Second, the college contended that plaintiff's claim was barred by ORS 659A.030(1)(a), because Christianity was a "bona fide occupational qualification" for the position for which plaintiff applied. Third, the college argued that plaintiff's claim was barred by a "ministerial exception," based on its right to the free exercise of religion, protected by the First Amendment to the United States Constitution and Article I, sections 2 and 3, of the Oregon Constitution.
Plaintiff urged summary judgment in his favor. Primarily, plaintiff contended that *1175 Warner Pacific was not entitled to the exemption in ORS 659A.006(4), because the college did not "prefer" a particular Christian applicant over plaintiff. In plaintiff's formulation, when the statute uses the term "prefer," it "requires that a specific applicant be preferred over another" applicant. Plaintiff argued that Warner Pacific cannot reject a non-Christian applicant on the basis of religion if the college does not actually fill the position by hiring a Christian applicant at that time from among applicants in the same applicant pool. *161 Plaintiff appended a footnote in his summary judgment memorandum questioning whether Warner Pacific failed to satisfy an element of ORS 659A.006(4)(c) that requires that the "employment be closely connected with or related to" Warner Pacific's "primary purposes." In that footnote, plaintiff stated:
"While Plaintiff also questions whether Defendant can establish that teaching psychology 'is closely connected with or related to the primary purposes' of [Warner Pacific], as required to establish entitlement to the exemption per ORS 659A.006(4)(c), the Court need not reach this issue due to [Warner Pacific's] failure to establish that it preferred a Christian candidate over Plaintiff."
Plaintiff did not offer an argument or explanation for his doubt about the issue; and he did not respond to the college's evidence and arguments addressed to that issue.
Plaintiff also challenged the college's other affirmative defenses. Plaintiff argued that Christianity was not a bona fide occupational qualification for the adjunct psychology professor position under ORS 659A.030(1)(a) ; and he asserted that the state and federal constitutions did not grant a "ministerial exception" permitting discrimination on the basis of religion in this case.
The trial court granted Warner Pacific's motion for summary judgment and denied plaintiff's cross-motion. The court concluded that ORS 659A.006(4)"protects Warner Pacific's decision not to hire plaintiff, a non-Christian, into the position for which he applied" and added that "Christianity is a bona fide occupational qualification within the meaning of ORS 659A.030(1)(a) for the position for which plaintiff applied." The court did not reach the constitutional arguments about a "ministerial exception."
On appeal, plaintiff renews his primary argument that the religious preference defense in ORS 659A.006(4) is narrowly limited to "preferring" an existing applicant from the current application pool. Without further explanation, he asserts that the college failed to offer evidence that the adjunct psychology professor position is "closely connected with or related to the primary purposes" of Warner Pacific *162 College. Additionally, plaintiff urges two new arguments on appeal. He argues that ORS 659A.006(4)(a) requires that any preferred applicant must be of the same particular church as Warner Pacific, rather than simply be any Christian. And, due to a past hiring decision, plaintiff argues that there is a question of fact whether it is truly the "opinion of [Warner Pacific]" that "the preference will best serve the purposes of [Warner Pacific]" under ORS 659A.006(4)(b), because a professor who attended a Jewish synagogue was on its faculty.
The parties agree that Warner Pacific discriminated against plaintiff on the basis of his religion, but they dispute whether that discrimination was permitted under ORS 659A.006(4) (religious preference), ORS 659A.030(1) (bona fide occupational qualification) (BFOQ), or the state or federal constitutions ("ministerial exception"). The parties recognize that any one of those alternative defenses, if established, would defeat plaintiff's claim of religious discrimination under ORS 659A.030(1)(a).
II. THE RELIGIOUS PREFERENCE EXEMPTION
A. Statutory Scheme
Plaintiff's argument about the terms of the preference exemption presents a question of statutory interpretation about what the legislature intended in ORS 659A.006(4) when it used the terms to "prefer an employee, or an applicant for employment *** over another." When construing a statute, we consider its text, context, and legislative history to discern legislative intent. State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009).
*1176 Those critical terms appear in the context of Oregon's statutes prohibiting discrimination in employment. Oregon has declared the "opportunity to obtain employment *** without unlawful discrimination because of *** religion *** to be a civil right." ORS 659A.006(2). To that end, ORS 659A.030(1)(a) prohibits "an employer, because of an individual's *** religion *** to refuse to hire or employ the individual or to bar *** the individual from employment." Religious discrimination in employment constitutes an "unlawful employment practice." Id.
*163 Notwithstanding that proscription, the Oregon legislature has exempted religious organizations from that mandate if certain conditions are met. The statute at issue, ORS 659A.006(4), provides:
"It is not an unlawful employment practice for a bona fide church or other religious institution, including but not limited to a school, hospital or church camp, to prefer an employee, or an applicant for employment, of one religious sect or persuasion over another if:
"(a) The religious sect or persuasion to which the employee or applicant belongs is the same as that of the church or institution;
"(b) In the opinion of the church or institution, the preference will best serve the purposes of the church or institution; and
"(c) The employment involved is closely connected with or related to the primary purposes of the church or institution and is not connected with a commercial or business activity that has no necessary relationship to the church or institution."
When those conditions are met, ORS 659A.006(4) provides an exception that permits religious organizations to discriminate on the basis of religion in employment within their own organizations.
B. To Prefer an Employee or Applicant over Another
The parties frame their dispute urging two very different interpretations of the exception in ORS 659A.006(4). Plaintiff's interpretation gives the college a circumscribed choice; Warner Pacific's interpretation gives the college more flexibility in exercising its choice.
As noted, plaintiff argues that the college did not satisfy the statutory exception, because the college did not "prefer" a particular applicant "over another." Plaintiff reasons that " 'preference' indicates a choice between multiple options" and that "to prefer" refers "to how a candidate's credentials should be weighted vis a vis the credentials of other applicants." As an example, plaintiff cites *164 ORS 408.230, which requires a public employer to accord "preference points" to military veterans in applications for public employment.[1] Implicitly, plaintiff assumes that a religious school must fill a new position and, expressly, plaintiff asserts that the school must hire from among applicants only. Plaintiff argues "that Oregon did not intend to allow a [religious] school to avoid hiring a qualified individual when another qualified individual of a preferred religion did not apply." That argument includes two subordinate assumptions. First, in plaintiff's view, the college could not refuse to hire a non-Christian at the present time in order to prefer a suitable Christian candidate later. Second, in plaintiff's view, the college could not refuse to hire a non-Christian applicant for a new job because it preferred to assign the work to existing Christian employees. In plaintiff's view, the statute permits the college a religious preference only if the college fills the position from among applicants in the present hiring pool.
In the college's view, religious preference permits a choice not to hire at all, to hire later, or to use current employees. The college complains that any other interpretation is contrary to the legislature's evident purpose in enacting the religious exemption. To illustrate, the college posits that, if plaintiff's interpretation governed, then, when a job is posted and only a single applicant responds, a religious organization would be forced to *1177 hire a person even if the applicant spurned the faith of the religious organization. According to the college, plaintiff's interpretation would force a religious organization to choose whether to violate Oregon's law (if so construed) or hire a person of a conflicting faith for a position that is "closely connected with or related to the primary purposes of the church or institution." See ORS 659A.006(4)(c) (using that phrase).
The parties' disagreement seems predictable. The legislature has not defined the phrase, "prefer an employee, *165 or an applicant * * * over another," as the phrase is used in ORS 659A.006(4). Because the legislature has not defined those words, we may consider the words' ordinary, plain meanings. PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993). In its most common usage, the central term, "prefer," means: "to have a preference for : choose : like better : value more highly." Webster's Third New Int'l Dictionary 1787 (unabridged ed. 2002). It can mean "to choose as more desirable; like better." The American Heritage Dictionary 976 (second college edition 1982). Helpfully, the term "prefer," appears in the context of the related terms, "over another." Thus, the phrase is comparative. It is suggestive, as plaintiff says, of a "choice between multiple options."
Contrary to plaintiff's view, however, the statute does not specify a preference of an applicant "over another" applicant . Rather, the statute expressly permits a religious organization "to prefer an employee , or an applicant for employment *** over another." (Emphasis added.) Given those additional terms (employee or applicant), the religious preference statute is quite unlike the veteran's preference statute in the public sector, which mandates a comparison of the veteran-applicant with another "applicant" in a present pool of applicants. See ORS 408.230(4) (requiring comparison of points in applicant pool).[2] Consequently, the phrase, "prefer an employee, or an applicant *** over another," raises the questions whether an employer may only prefer an applicant over another applicant, whether an employer may prefer an employee over an applicant, or whether an employer could simply prefer not to hire at this time.
The statute's text suggests an answer. That text explicitly permits a religious organization to "prefer an employee , or an applicant *** over another." (Emphasis *166 added.) Nothing in that language suggests that the legislature meant to prohibit the college from preferring a Christian employee over a non-Christian applicant, by filling the position with a Christian employee. Similarly, nothing in that language suggests that the legislature meant to prohibit the college from preferring not to hire a non-Christian applicant and choosing instead to await a later hiring cycle or to assign the work to a Christian employee. Regardless whether the position is filled or not, both employment decisions accomplish the same purpose. Both are ways to "prefer" an employee of like-faith over an applicant of another faith.
To the extent that it is relevant to the issue at hand, the statutory and legislative history, preceding ORS 659A.006(4), support our reading of its text. That history provides some guidance in understanding the origin of the religious preference exemption and, inferentially, the legislative intention that lies behind the religious preference provision. As we will explain, that history reflects a legislative desire to permit religious organizations to discriminate in employment by favoring members of their own faith within their organizations.
With a Fair Employment Practices Act in 1949, Oregon enacted a ban on employment discrimination in the private sector many years before the federal statute. Or. Laws 1949, ch. 221, §§ 1-14; PSU Association of University Professors v. PSU , 352 Or. 697, 708-09, 291 P.3d 658 (2012) (Oregon's statute enacted "many years" before Title VII of the Civil Rights Act of 1964, 42 USC § 2000e to 2000e-2 ). Under Oregon's Act, "[t]he opportunity *1178 to obtain employment without discrimination because of race, religion, color or national origin" was "declared to be a civil right." Or. Laws 1949, ch. 221, § 3 (later codified as former ORS 659.020(2) (1953) ). The refusal to hire or employ, to bar, or to discharge a person in violation of that right was declared an unlawful employment practice. Or. Laws 1949, ch. 221, § 5(1) (later codified as former ORS 659.030(1)(1953) ).
From the outset, however, a religious organization was wholly exempt from the statutory proscription against *167 employment discrimination, because the definition of an "employer" subject to the scheme did not include a "religious association or corporation" at all. Or. Laws 1949, ch. 221, § 4(5) (former ORS 659.010(4) (1953) ).[3] Insofar as the original act was concerned, a religious organization could engage in the several forms of employment discrimination-race, religion, color, or national origin-that subject employers could not. The act remained essentially unchanged until 1969. PSU Association of University Professors , 352 Or. at 708-09, 291 P.3d 658 (observing no intervening changes).
In 1969, House Bill (HB) 1297 was proposed with several original purposes and grew to include others. Among the original purposes, the definition of "employer" was changed to expand the act's coverage from employers with six or more employees to any employer with a single employee. HB 1297, § 1 (amending former ORS 659.010(6) (1967) ). In addition, the wholesale exemption of religious organizations was deleted. Id . In its place, HB 1297 proposed to add an exemption provision, describing more religious organizations, "including but not limited to a school, hospital or church camp," and permitting them to prefer an employee or applicant of one religious sect or persuasion over another "when, in its opinion, such a preference will best serve the purposes of such institution." HB 1297, § 2 (amending former ORS 659.020(2) (1967) ).[4] As introduced, the bill provided the religious exemption without any other conditions or qualifiers. Applicability of the *168 exemption turned solely on the "opinion" of the religious organization.[5]
While the 1969 bill was before the House of Representatives, a committee adopted an amendment including two of three paragraphs that would be added to the religious preference exemption. The amendment permitted an organization to prefer an employee or an applicant of one sect or persuasion over another when:
"(a) That religious sect or persuasion to which the employe[e] or applicant belongs is the same as that of such church or institution; and
"(b) In the opinion of such bona fide church or sectarian religious institution, such a preference will best serve the purposes of such church or institution."
Proposed Amendments to House Bill 1297, Mar. 24, 1969; Minutes, House Committee on Labor and Management, Mar. 24, 1969, 4. A later amendment occurred in the Senate. Minutes, Senate Committee on Labor and Industries, May 7, 1969, 1. A senate committee added a new paragraph requiring that:
*1179 "(c) The employment involved is closely connected with or related to the primary purposes of the church or institution and is not connected with a commercial or business activity which has no necessary relationship to the church or institution, or to its primary purposes."
Proposed Second Amendments to House Bill 1297, May 7, 1969.
Representative Connie McCready, a primary co-sponsor of the bill, testified before the Senate committee that the bill was "unique in that it particularly permits discrimination ." Tape Recording, Senate Committee on Labor and *169 Industries, HB 1297, Apr. 23, 1969, Tape 5 (statement of Rep. Connie McCready) (emphasis added). She explained:
"HB 1297 is rather unique in that it specifically authorizes discrimination . *** It would amend [ORS] 659.020 *** to permit religious institutions to show preference in employment to members of their own faith . The original bill was amended in the House side to *** go a little bit more specific in saying that they may discriminate on the basis of religion as long as it is the same religion of the church that is discriminating."
(Emphases added.) She elaborated about the meaning of the proposed legislation: "I interpret [HB 1297] to mean that a Catholic church could not-hire a Christian Scientist practitioner as superintendent of their Sunday school." Id . (emphasis added).[6]
Addressing the last amendment, Representative McCready reported that the legislation would forbid a religious organization that is engaged in an entirely for-profit business enterprise from discriminating against employees who do not share the same faith. She told the committee members that there were instances in Oregon and Utah "where a church bought a for-profit business and then fired all the employees of this business, straight for-profit making business, and hired members of their own religion *** it had nothing to do with the church or the principles of the church. This [legislation] would tighten this up." Id .
Chairman Lent asked Representative McCready whether the church would "have a closed shop setup in regards to business because they own it?" Id . Representative McCready responded, "No, this amendment says that they cannot discriminate on the basis of religion unless this is something particularly related to the church and the *170 teachings itself." Id . The religious organizations would not be allowed to lawfully discriminate on the basis of religion "unless they could prove that this has a direct bearing on their religion."[7]
The legislature revisited the religious exemption in 2007 with Senate Bill (SB) 2, which relocated the religious exemption within the same statute and enacted other provisions relating to religious organizations and sexual orientation. See Or. Laws 2007, ch. 100, § 3 (deleting exemption in former ORS 659A.006(2) ; restating exemption as subsection (4); enacting new provisions on sexual orientation in subsections (3) and (5)). In doing so, the legislature made reference to the existing religious exemption.
*1180 In the floor debate, one of the bill's carriers, Representative McPherson, was asked about differences in the bill between subsections (4), the existing religious exemption, and (5), one of the new provisions on religious organizations and sexual orientation. He responded that subsection (4) was in the existing statute and had been a feature of the law that permitted a church to "favor its own members." Audio Recording, House Floor Debate, SB 2, Apr. 17, 2007, at 2:48. He was asked whether "adoption of SB 2 means that a Catholic hospital-say, for example, in Eugene-could refuse an employment to a Baptist or a Muslim under the religious clause but not refuse employment to a gay or lesbian citizen." Id. He responded that "[t]here is a different standard carved out here for employment of one's own membership," and that the standard would be that "one could favor a member of one's own religion" in hiring within the institution, and that subsection (5) sets *171 out a broad exemption for religious organizations to discriminate on the basis of sexual orientation.
His answers corresponded to those that had been given in committee. Addressing a religious organization's exemption, Representative Hunt stated,
"[T]hose terms [closely connected and related to the primary purpose] are specifically used in the current religious exemption that allows a Baptist church to not hire a Catholic or a Mormon or a Jewish person or a Muslim, that is the language already in there. *** [T]he fact that there's not a great body of case law *** demonstrates that language has worked in Oregon in terms of allowing churches to, discriminate is not really the right term, but allowing churches to select applicants for employment from their own religious group or sect as the statute says ***."
Tape Recording, House Committee on Elections, Ethics, and Rules, SB 2, Apr. 10, 2007 (Testimony of Rep. Hunt (emphasis added)); id. ("Section 4 also remains the same in terms of the, allowing, employment practices that would protect, that would allow employers to make decisions based on religious issues ." (Emphasis added.)).
Taken together, the legislative record in 1969 and 2007 shows a consistent understanding of a religious exemption for employment within religious organizations. In 1969, the testimony of the bill's primary co-sponsor reflects that the enactment was intended to "specifically authorize[ ] discrimination *** to permit religious institutions to show preference in employment to members of their own faith." (Emphasis added.) In 2007, the bill's carrier explained that a Catholic organization could "refuse an employment to a Baptist or a Muslim" on religious grounds (emphasis added); and a legislator had explained that a Baptist organization could choose "to not hire" a Catholic, Mormon, or Jewish person. Id . That understanding of "preference" expressly contemplated a refusal to hire-at least within circumstances otherwise described in statute.
Although the reformulated religious exemption added subparts to condition the exemption ( ORS 659A.006 (4)(a), (b) and (c) ), no terms expressly restricted how religious *172 preference was to be exercised. Nothing was expressed in the statutory text or legislative records to suggest that, when filling a new position, a religious organization could exercise its preference only by hiring another applicant of the preferred faith from the present applicant pool. Instead, statutory text and legislative history indicate that a religious organization may simply choose not to hire as a means of exercising its preference. Accordingly, Warner Pacific could lawfully "prefer" not to hire a non-Christian applicant, provided that it satisfied other pertinent statutory requirements.
C. Closely Connected With the Primary Purposes
We turn to one of those statutory requirements posed in ORS 659A.006(4)(c). That is the question whether Warner Pacific demonstrated, as a matter of law, that the "employment involved is closely connected with or related to the primary purposes of the church or institution and is not connected with a commercial or business activity that has no necessary relationship to the church or institution."
As the proponent of an affirmative defense and the moving party on summary judgment, the college has the burden of producing evidence sufficient to support the defense.
*1181 See ORCP 47 C (party has burden of coming forward if party has burden of persuasion at trial); Sunset Presbyterian Church v. Brockamp & Jaeger , 254 Or. App. 24, 30, 295 P.3d 62 (2012), aff'd , 355 Or. 286, 325 P.3d 730 (2014) (describing defendant's standard on affirmative defense at summary judgment). Assuming the college proffered such evidence, plaintiff, as the party opposing the motion, may identify within the college's evidence, or offer his own contrary evidence, that creates a material issue of fact on those issues raised in the motion. See Jensen v. Hillsboro Law Group, PC , 287 Or. App. 697, 705, 403 P.3d 455 (2017) (a party who opposes summary judgment must show a material issue of fact on those issues raised in the motion). There is no genuine issue of material fact if, "based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party." ORCP 47 C. If there is no genuine issue of material fact, then the court resolves the religious exemption as a matter of law.
*173 On this element of the religious preference exemption, plaintiff did not indicate a factual dispute by providing his own contrary evidence or by identifying conflicting evidence within the evidence offered by the college. Instead, in his memorandum to the trial court, plaintiff included only an incidental footnote to "question" the relationship between the "employment" and the college's "primary purposes," but he told the trial court that it did not need to address the issue, because he believed that his view of the term "preference" should be dispositive. In his brief on appeal, plaintiff made only a single conclusory statement without any developed argument to explain why the trial court erred on this particular element. In his brief, plaintiff argued simply, "Warner Pacific has presented no evidence to establish that teaching psychology 'is closely connected with or related to the primary purposes' of Warner Pacific." (Emphasis added.) As a consequence, we address this element and the evidence that the college offered in support of it. We do so in order to determine whether indeed there was "no evidence" as plaintiff contends, or whether, as the college contends, the college's evidence satisfied ORS 659A.006(4)(c), as a matter of law. We address first the evidence as to the college's primary purposes and next the evidence reflecting a close connection or relationship to those purposes.
Warner Pacific's "primary purpose" is reflected in its history as a religious institution, its governing documents, faculty handbook, and employee application. Warner Pacific is a private Christian college operated as an "agency" of the Church of God in Anderson, Indiana, with a history as a Bible college. The college's articles of incorporation state that the "purposes" of the college shall be
"primarily to conduct a liberal arts college and theological seminary together with any and all courses of instruction deemed desirable to accomplish its purposes, namely: To develop and train men and women primarily for Christian service, to make available college education on a Christian campus, and to publish and circulate books, periodicals, teaching outlines and correspondence courses in the interests of Christian education."
Dr. Dawson, Dean of Faculty and Vice President for Academic Affairs, stated in his declaration that "our hope and *174 expectation was that our faculty members would convey the college's Christian faith in the classroom." Dawson declared, "If [plaintiff] had been selected for the position, [plaintiff] would have been required to assist in conveying Warner Pacific's Christian faith to students in the classroom."
The faculty handbook indicates that the college expects the faculty to advance the college's purpose to provide a "quality liberal arts education in a vital Christian community." The handbook explains that Warner Pacific "seeks to integrate Christian Faith and academic learning." The faculty handbook says that instructors are required to "foster[ ] an environment in which freely chosen Christian faith can be deepened and spiritual relevance in everyday life clarified."
Warner Pacific expects employees to subscribe to its Employment and Lifestyle Standards. They say, "Central to Warner Pacific's identity as a Christ-centered higher education is the policy of hiring persons whose personal and professional lives reflect" Christian *1182 values. The standards require from the faculty, in part: (1) a "belief in the deity of and commitment to Jesus Christ and the Christian faith," (2) the "practice of following Christ," (3) a "vitality of Christian experience," (4) an ability to support students with "intellectual, social, physical, emotional, and spiritual challenges," (5) a "sensitivity and support for the mission, core themes, vision, values, ethos and traditions of the Warner Pacific College community," and (6) a "commitment to teaching and serving in harmony with the doctrines of the Bible." The related "Employee Agreement" requires "each employee to affirm a personal faith in Jesus Christ."
The college also provided evidence that the college sees employment as an adjunct professor of psychology to be closely connected with or related to Warner Pacific's primary purpose of cultivating a Christ-centered learning environment. That evidence consisted of declarations of college administrators, the course textbook, and a course description. Steven Stenberg, a college vice president responsible for personnel, explained;
"Even some ostensibly 'secular' classes at Warner Pacific (including classes in psychology) incorporate Christian *175 content such as Scripture readings, Christian meditations, and other Christ-centered exercises and activities[.] *** For that reason, it was essential that the successful candidate for the teaching position for which [plaintiff] applied be Christian him- or herself."
The college supported his statement with documentary evidence.
The college identified the textbook for the psychology class as Exploring Psychology by David Myers (Worth Publishers, 9th ed. 2012), saying that Myers "subtly weaves a commitment to a Christian worldview into [a] rigorously scientific approach."
The college also offered a detailed 48-page description of the course. That syllabus includes lesson plans that show that the professor is required, at times, to read scripture verses to the students and conduct Christian meditations on various occasions throughout the semester. For example, the lecture notes for "Workshop Two" recommend a New Testament scripture reading to help foster discussion in the classroom (1 Corinthians 2:9). The lecture notes explain the scriptural theme:
"With all the miracles of the brain and the sense organs, there is still a spiritual reality that surpasses these marvelous parts of the human body. Students may be asked to share what meaning this verse or principle has for them in light of their study."
(Emphasis added.) Similarly, for "Workshop Three," the lecture notes require the professor to conduct a meditation and scripture reading from the book of Psalms 143:5. The lecture notes urge the instructor to explain to students who think that psychology and religion are at odds that "we are created as psychological beings in the image of God" and that psychological capacities "are part of one's creation." For "Workshop Four," the lecture notes require the professor to read a scripture verse 2 Corinthians 5:9 and include this instruction to the professor:
"You [the professor] may say the following, if desired, 'Tonight we are studying motivation. This New Testament writer, the Apostle Paul, clearly states his own achievement motivation: to be pleasing to God. As we consider *176 our motivation in a psychological framework, we can think of our spiritual motivation being both the foundation and the top of Maslow's Hierarchy, surpassing that of self-actualization. In truth, it is when one has the 'achievement motivation' to be pleasing to God, which [sic] a finer sort of self-actualization emerges .' "
(Emphasis added.) Together, those lesson plans illustrate how Warner Pacific seeks to infuse a Christian perspective into an "ostensibly secular course."
The textbook and syllabus reflect the college's intent, expressed in its Board Policies Manual, that "a Christian worldview be integrated into all academic programs." With that evidence, Warner Pacific demonstrated its conviction that the employment of its adjunct professor of psychology is closely connected with or related to the college's primary purposes.
We recognize that ORS 659A.006(4)(c) requires a court to determine whether employment is "closely connected" to the "primary purposes" of a religious organization. At the *1183 same time, we appreciate that our determination is a sensitive determination when a religious school shows that it teaches an "ostensibly secular" subject from a religious perspective. That is so because our determination involves judicial self-restraint rooted in an express legislative, if not constitutional, respect for a religious perspective. See generally ORS 659A.006(4) (religious preference exemption); Or. Const., Art. I, §§ 2, 3 (religion sections); U.S. Const., Amend I (establishment and free exercise clauses).[8] That self-restraint cautions against second-guessing the school's well-documented decision to teach a subject from a religious perspective. Self-restraint cautions against second-guessing a school's perspective when the school sees, within a course *177 subject, a religious significance to be appreciated, discussed, and developed. Cf. Hall v. Baptist Memorial Health Care Corp. , 215 F.3d 618, 626 (6th Cir. 2000) (observing that "the First Amendment does not permit federal courts to dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices"); Little v. Wuerl , 929 F.2d 944, 946-47 (3d Cir. 1991) (explaining the court's "prudential policy," in construing a statute, to avoid constitutional issues where Title VII would impinge on the free exercise and establishment clauses of the First Amendment).
The question before us in this case is not whether the employment of all instructors of all subjects could be shown to involve employment closely connected with or related to a church-related college's primary purposes. We do not decide whether Warner Pacific could require a Christian faith of all instructors, let alone all employees. Our decision extends no further than the record of this case, and this is a record where the evidence on this particular element was that from the college. Meanwhile, plaintiff only "questioned" the connection element in a footnote in a memorandum on summary judgment, but did not then identify any factual dispute on this particular element of the preference exemption. Plaintiff merely told the trial court that it need not reach the issue. That was insufficient to create a genuine dispute of material fact about the application of ORS 659A.006 (4)(c).[9] On appeal, plaintiff has done little more.
Only a question of law remains. As quoted above, this element of the preference exemption requires a close connection to the primary purposes of a religious organization, while proscribing such a preference in employment in commercial activity with no necessary relationship to the religious organization. Here, the undisputed facts establish that Warner Pacific had integrated this faculty position, and the course to be taught, with the college's primary purpose of a faith-infused education. And, no evidence was offered or *178 permitted a reasonable inference that the employment was "connected with a commercial or business activity that has no necessary relationship" to the college. Therefore, in the absence of developed arguments or the identification of disputed facts on this element, the college succeeded in demonstrating that this faculty position is closely connected with or related to the primary purposes of Warner Pacific so as to satisfy ORS 659A.006(4)(c), as a matter of law.
D. Other Arguments
In two final arguments on appeal, plaintiff contends that the college failed to satisfy other elements of ORS 659A.006(4)(a) and (b). Those subparts require that
"(a) The religious sect or persuasion to which the employee or applicant belongs is *1184 the same as that of the church or institution;
"(b) In the opinion of the church or institution, the preference will best serve the purposes of the church or institution[.]"
Those elements require little discussion.
First, plaintiff makes a cursory argument that Warner Pacific must prefer only members of the Church of God, Anderson, Indiana, and cannot give preference to the Christian faith generally or to other Christian denominations such as Catholic, Baptist, or Lutheran. See ORS 659A.006(4)(a) (preference for employee or applicant of the same sect or persuasion). The college, however, described its "persuasion" in a more inclusive way. Its Standards statement explained, "[f]rom its inception, the Church of God has resisted condensing the Scriptures into a formal creed." The college, "rather than requiring subscription to an institutional doctrinal statement, asks each employee to affirm a personal faith in Jesus Christ."
As it happens, we need not explore plaintiff's argument-that the college cannot prefer all Christians-because plaintiff's argument was not presented in the trial court, and plaintiff failed to present a dispute of fact regarding whether the Christian employees who were assigned to teach the course were not of the same "sect or persuasion." Without a preserved or developed argument, it now is too *179 late to challenge the college's preference for a professor of a Christian persuasion.
Second, plaintiff claims that, under ORS 659A.006 (4)(b), "there is a question of fact as to whether it is the 'opinion of the church or institution' that 'the preference will best serve the purposes of the church or institution.' " Plaintiff points to an inference that he had urged in the trial court on a different argument about whether a religious qualification was "reasonably necessary" in terms of the BFOQ defense. As to that different issue, he had urged that a fact-finder could infer that Warner Pacific's prior president must have once made an exception to its policy to hire Christians because another professor attends a Jewish synagogue.[10]
Ironically, both parties agree that, in this instance, religious preference was the decisive factor in refusing to hire plaintiff. A religion-based decision is the premise of plaintiff's discrimination claim. That is why plaintiff sued the college. Plaintiff does not dispute that a preference for a Christian was the reason for his rejection, and plaintiff does not claim that the college had some other motivation or used religious preference as a pretext.[11]
Ultimately, plaintiff's argument about the college's opinion about religious preference under ORS 659A.006 (4)(b) need not be resolved on appeal, because plaintiff did not present that argument on this issue in the trial court *180 so as to dispute whether it is truly "the opinion" of the college that "the preference will best serve the purposes" of the college.
III. CONCLUSION
The religious preference exemption provides Warner Pacific an effective defense to plaintiff's claim. Without reaching other defenses, we conclude that the trial court did *1185 not err when it granted summary judgment to Warner Pacific based on ORS 659A.006(4).
Affirmed.

A public employer must grant a preference to a veteran or disabled veteran who applies for employment by granting five or 10 preference points, respectively, to a score in screening or examinations. ORS 408.230(1), (2). The statute expressly provides that a public employer "shall appoint an otherwise qualified veteran or disabled veteran" if the results with the preference equal or exceed those of other applicants. ORS 408.230(4).

Under the veteran's preference statute:
"A public employer shall appoint an otherwise qualified veteran or disabled veteran to a vacant civil service position if the results of a veteran's or disabled veteran's application examination , when combined with the veteran's or disabled veteran's preference, are equal to or higher than the results of an application examination for an applicant who is not a veteran or disabled veteran."
ORS 408.230(4) (emphases added).

At that time, former ORS 659.010(4) (1953) provided:
" 'Employer' does not include a club exclusively social, or a fraternal, charitable, educational or religious association or corporation, if such a club, association or corporation is not organized for private profit, nor does it include any employer with less than six persons in his employ."

Showing the new language in italics, the original bill proposed:
"(2) The opportunity to obtain employment without discrimination because of race, religion, color or national origin hereby is recognized as and declared to be a civil right. However, this section shall not be construed to prevent a bona fide church or sectarian religious institution, including but not limited to a school, hospital or church camp, from preferring an employe [e ] or applicant for employment of one religious sect or persuasion over another when, in its opinion, such a preference will best serve the purposes of such institution. "
HB 1297, § 2 (amending former ORS 659.020(2) (1967) ).

In 1969, HB 1297 began as a renewed effort to pass what had been an unsuccessful effort to pass HB 1508 in 1967. Tape Recording, House Committee on Labor and Management, HB 1297, Mar. 12, 1969 (statement of Representative Robert Davis). In 1967, HB 1508 had passed both houses of the legislature but was in conference committee at adjournment. Id. ; 1967 Senate and House Journal 807-08 (HB 1508).

In context, we understand "not-hire" to mean that a religious organization could choose not to hire an applicant of a different faith.
In 1967, Representative McCready made a similar statement about HB 1508, the precursor to HB 1297 (1969). As a sponsor, she explained:
"House Bill 1508 is unique in that it specifically authorizes discrimination. It would amend ORS 659.020 to permit religious institutions to show preference in employment to members of their own faith."
Exhibit, House Committee on Labor and Management, HB 1508, Mar. 27, 1967, 1 (written statement of Rep. Connie McCready).

Coincidentally, HB 1297 later came to include the addition of a ban on sex discrimination. At the urging of then Senator Betty Roberts, the House committee amended the bill to proscribe sex discrimination. Minutes, Senate Committee on Labor and Industries, Apr. 23, 1969, 1 (statement of Senator Roberts about the origin of the amendments); Minutes, House Committee on Labor and Management, Mar. 24, 1969, 5. That amendment, adding "sex" to the protected classes, prompted a corresponding BFOQ amendment. See Or. Laws 1969, ch. 618, § 3 (former ORS 659.030(1) ). In our review of the legislative history, we found no testimony or commentary to suggest that the words employed or the concerns about the BFOQ amendment were related to the words or concerns about the religious preference exemption. They were separate issues, and, because the BFOQ language came later, the meaning of their terms developed independently.

Article I of the Oregon Constitution provides, in relevant part:
"Section 2. All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.
"Section 3. No law shall in any case whatever control the free exercise, and enjoyment of religeous [sic] opinions, or interfere with the rights of conscience."
In relevant part, the First Amendment to the United States Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ***."

It is "not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself." Beall Transport Equip. Co. v. Southern Pacific Transp ., 186 Or. App. 696, 700 n. 2, 64 P.3d 1193, adh'd to on recons , 187 Or. App. 472, 68 P.3d 259 (2003).

On the BFOQ issue, plaintiff had offered evidence that a professor of Biblical studies was, at that time in 2014-15, an active member of a local synagogue. The college responded with evidence that the same professor was a masters and doctoral graduate of two Christian seminaries, was an ordained clergy member of the Church of God, and had completed his employment application in 1997 with the college attesting to a Christian faith, which he reaffirmed in 2015. Whether or not, taken together, those facts presented a genuine issue of material fact, they were raised with regard to a different issue-the "reasonably necessary" issue in the BFOQ defense.

We note that some courts have held that a religious organization may make an exception without losing its religious exemption for other employment decisions. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n , 503 F.3d 217, 230 (3d Cir. 2007), cert. den. , 553 U.S. 1004, 128 S.Ct. 2053, 170 L.Ed.2d 793 (2008) (a religious organization "need not enforce an across-the-board policy of hiring only coreligionists" in order to claim Title VII's religious exemption); Killinger v. Samford University, 113 F.3d 196, 199-200 (11th Cir. 1997) (no need for institution to engage in a "strict policy of religious discrimination" to be entitled to the exemption). That, however, is an issue that we do not decide in this case.